# FEDERAL COMMUNICATIONS COMMISSION *v.* LEAGUE OF WOMEN VOTERS OF CALIFORNIA ET AL.

No. 82–912.   Argued January 16, 1984—Decided July 2, 1984

BRENNAN, J., delivered the opinion of the Court, in which MARSHALL, BLACKMUN, POWELL, and O'CONNOR, JJ., joined. WHITE, J., filed a dissenting statement, *post,* p. 402. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C. J., and WHITE, J., joined, *post,* p. 402. STEVENS, J., filed a dissenting opinion, *post,* p. 408.

*Samuel A. Alito, Jr.,* argued the cause for appellant. With him on the briefs were *Solicitor General Lee, Assistant*

Attorney General McGrath, Acting Assistant Attorney General Willard, Deputy Solicitor General Bator, Anthony J. Steinmeyer, and Michael Jay Singer.

Frederic D. Woocher argued the cause for appellees. With him on the brief were Bill Lann Lee and John R. Phillips.*

JUSTICE BRENNAN delivered the opinion of the Court.

Moved to action by a widely felt need to sponsor independent sources of broadcast programming as an alternative to commercial broadcasting, Congress set out in 1967 to support and promote the development of noncommercial, educational broadcasting stations. A keystone of Congress' program was the Public Broadcasting Act of 1967, Pub. L. 90–129, 81 Stat. 365, 47 U. S. C. § 390 *et seq.*, which established the Corporation for Public Broadcasting, a nonprofit corporation authorized to disburse federal funds to noncommercial television and radio stations in support of station operations and educational programming. Section 399 of that Act, as amended by the Public Broadcasting Amendments Act of 1981, Pub. L. 97–35, 95 Stat. 730, forbids any "noncommercial educational broadcasting station which receives a grant from the Corporation" to "engage in editorializing." 47 U. S. C. § 399. In this case, we are called upon to decide whether Congress, by imposing that restriction, has passed a "law . . . abridging the freedom of speech, or of the press" in violation of the First Amendment of the Constitution.

---

*Larry S. Solomon* filed a brief for Mobil Corp. as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union by *Burt Neuborne* and *Charles S. Sims;* for CBS, Inc., et al. by *J. Roger Wollenberg, Timothy B. Dyk, Erwin G. Krasnow,* and *J. Laurent Scharff;* for the National Black Media Coalition by *Charles M. Firestone;* and for the Public Broadcasting Service et al. by *Lawrence A. Horn, Nancy H. Hendry,* and *Theodore D. Frank.*

# I

## A

The history of noncommercial, educational broadcasting in the United States is as old as broadcasting itself.[1] In its first efforts to regulate broadcasting, Congress made no special provision for noncommercial, educational broadcasting stations. Under the Radio Act of 1927 and the Communications Act of 1934, such stations were subject to the same licensing requirements as their commercial counterparts. As commercial broadcasting rapidly expanded during the 1930's, however, the percentage of broadcast licenses held by noncommercial stations began to shrink. In 1939, recognizing the potential effect of these commercial pressures on educational stations, the Federal Communications Commission (FCC or Commission) decided to reserve certain frequencies for educational radio, 47 CFR §§ 4.131–4.133 (1939), and in 1945, the Commission allocated 20 frequencies on the new FM spectrum exclusively for educational use, FCC, Report of Proposed Allocations 77 (1945). Similarly, in 1952, with the advent of television, the FCC reserved certain television channels solely for educational stations. *Television Assignments*, 41 F. C. C. 148 (1952). Helped in part by these allocations, a wide variety of noncommercial stations, some funded by state and local governments and others by private donations and foundation grants, developed during this period.[2]

It was not until 1962, however, that Congress provided any direct financial assistance to noncommercial, educational broadcasting. This first step was taken with the passage of

---

[1] See S. Frost, Education's Own Stations 464 (1937).

[2] For a review of the history of public broadcasting, see Carnegie Commission on Educational Television, Public Television: A Program for Action 21–29 (1967) (Carnegie I); Carnegie Commission on the Future of Public Broadcasting, A Public Trust 33–34 (1979) (Carnegie II). See also S. Rep. No. 93–123, pp. 2–6 (1973).

the Educational Television Act of 1962, Pub. L. 87–447, 76 Stat. 64, which authorized the former Department of Health, Education, and Welfare (HEW) to distribute $32 million in matching grants over a 5-year period for the construction of noncommercial television facilities.

Impetus for expanded federal involvement came in 1967 when the Carnegie Corporation sponsored a special commission to review the state of educational broadcasting. Finding that the prospects for an expanded public broadcasting system rested on "the vigor of its local stations," but that these stations were hobbled by chronic underfinancing, the Carnegie Commission called upon the Federal Government to supplement existing state, local, and private financing so that educational broadcasting could realize its full potential as a true alternative to commercial broadcasting. Carnegie I, at 33–34, 36–37.[3] In fashioning a legislative proposal to carry out this vision, the Commission recommended the creation of a nonprofit, nongovernmental "Corporation for Public Television" to provide support for noncommercial broadcasting, including funding for new program production, local station operations, and the establishment of satellite interconnection facilities to permit nationwide distribution of educational programs to all local stations that wished to receive and use them. Id., at 37–38.

The Commission's report met with widespread approval, and its proposals became the blueprint for the Public Broadcasting Act of 1967, which established the basic framework of the public broadcasting system of today. Titles I and III of

---

[3] Although its recommendations were later applied by Congress to noncommercial educational radio as well, the Commission's report addressed solely the problems and prospects of what it called "public television." This term was coined by the authors of the report not to distinguish noncommercial, educational broadcasting from "private" commercial broadcasting, but rather to identify a larger view of the potential of noncommercial broadcasting comprising not only "instructional" programming but also educational, political, and cultural programming broadly defined. See Carnegie I, at 1.

the Act authorized over $38 million for continued HEW construction grants and for the study of instructional television. Title II created the Corporation for Public Broadcasting (CPB or Corporation), a nonprofit, private corporation governed by a 15-person, bipartisan Board of Directors appointed by the President with the advice and consent of the Senate.[4] The Corporation was given power to fund "the production of . . . educational television or radio programs for national or regional distribution," 47 U. S. C. § 396(g)(2)(B) (1976 ed.), to make grants to local broadcasting stations that would "aid in financing local educational . . . programming costs of such stations," § 396(g)(2)(C), and to assist in the establishment and development of national interconnection facilities. § 396(g)(2)(E).[5] Aside from conferring these powers on the Corporation, Congress also adopted other measures designed both to ensure the autonomy of the Corporation and to protect the local stations from governmental interference and control. For example, all federal agencies, officers, and employees were prohibited from "exercis[ing] any direction, supervision or control" over the Corporation or local stations, § 398, and the Corporation itself was forbidden to "own or operate any television or radio broadcast station," § 396(g)(3), and was further required to "carry out its purposes and functions . . . in ways that will most effectively assure the maximum freedom . . . from

[4] The structure of the Board was modified in 1981 to provide for 10, rather than 15 members. 47 U. S. C. § 396(c), as amended by Pub. L. 97–35, Title XII, § 1225(a)(1), 95 Stat. 726.

[5] In accordance with the Act, an interconnection system was formally developed in 1969 when the Public Broadcasting Service (PBS) was created. Today, PBS is a private, nonprofit membership corporation governed by a Board of Directors elected by its membership, which consists of the licensees of noncommercial, educational television stations located throughout the United States. See Brief for PBS et al. as *Amici Curiae* 1. National Public Radio (NPR) was established in 1970 and performs an analogous service for public radio stations.

interference with or control of program content" of the local stations. § 396(g)(1)(D).

B

Appellee Pacifica Foundation is a nonprofit corporation that owns and operates several noncommercial educational broadcasting stations in five major metropolitan areas.[6] Its licensees have received and are presently receiving grants from the Corporation and are therefore prohibited from editorializing by the terms of § 399, as originally enacted and as recently amended.[7] In April 1979, appellees brought this suit in the United States District Court for the Central District of California challenging the constitutionality of former § 399. In October 1979, the Department of Justice informed

---

[6] In addition to Pacifica Foundation, appellees include the League of Women Voters of California, and Congressman Henry Waxman, who is a regular listener and viewer of public broadcasting.

[7] As first enacted in 1967, § 399 provided:

"No noncommercial educational broadcasting station may engage in editorializing or may support or oppose any candidate for political office." Pub. L. 90–129, Title II, § 201(8), 81 Stat. 368.

Although the statutory language remained the same, this provision was redesignated as § 399(a) in 1973 when subsection (b), requiring public stations to "retain an audio recording of each of its broadcasts of any program in which any issue of public importance is discussed," was added. Pub. L. 93–84, § 2, 87 Stat. 219. Because appellees filed their complaint in 1979, their suit was initially directed at § 399(a). Subsection (b) was found unconstitutional by the Court of Appeals for the District of Columbia Circuit, *Community-Service Broadcasting of Mid-America, Inc.* v. *FCC*, 192 U. S. App. D. C. 448, 593 F. 2d 1102 (1978), and was deleted by Congress in 1981. Pub. L. 97–35, Title XII, § 1229, 95 Stat. 730.

Also as part of those 1981 amendments, Congress revised and redesignated former § 399(a) by confining the ban on editorializing to stations receiving CPB grants and by separately prohibiting political endorsements by all stations; § 399 in its current form provides in full:

"No noncommercial educational broadcasting station which receives a grant from the Corporation under subpart C of this part may engage in editorializing. No noncommercial educational broadcasting station may support or oppose any candidate for public office." 47 U. S. C. § 399.

both Houses of Congress and the District Court that it had decided not to defend the constitutionality of the statute.[8] The Senate then adopted a resolution directing its counsel to intervene as *amicus curiae* in support of § 399. Counsel appeared and subsequently obtained dismissal of the lawsuit for want of a justiciable controversy because the Government had decided not to enforce the statute. While appellees' appeal from this disposition was pending before the Court of Appeals for the Ninth Circuit, however, the Department of Justice under a new administration announced that it would defend the statute. The Court of Appeals then remanded the case to the District Court; the District Court permitted the Senate counsel to withdraw from the litigation, and, finding that a concrete controversy was now presented, vacated its earlier order of dismissal. While the suit was pending before the District Court, Congress, as already mentioned, see n. 7, *supra*, amended § 399 by confining the ban on editorializing to noncommercial stations that receive Corporation grants and by separately prohibiting all noncommercial stations from making political endorsements, irrespective of whether they receive federal funds. Subsequently, appellees amended their complaint to reflect this change, challenging only the ban on editorializing.[9]

---

[8] As then Attorney General Civiletti explained:

"After careful consideration, we have concluded that Section [399] violates the First Amendment guarantees of freedom of speech and freedom of the press by restricting the ability of public broadcasting stations to comment on matters of public interest. . . .

"The Department of Justice is, of course, fully mindful of its duty to support the laws enacted by Congress. Here, however, the Department has determined, after careful study and deliberation, that reasonable arguments cannot be advanced to defend the challenged statute." Letter from Attorney General Benjamin R. Civiletti to Senate Majority Leader Robert C. Byrd (Oct. 11, 1979), App. 13–14.

[9] In their amended complaint, appellees did not challenge the provision in § 399 prohibiting all noncommercial educational broadcasting stations from "support[ing] or oppos[ing] any candidate for public office." Neither

The District Court granted summary judgment in favor of appellees, holding that § 399's ban on editorializing violated the First Amendment. 547 F. Supp. 379 (1982). The court rejected the Federal Communication Commission's contention that "§ 399 serves a compelling government interest in ensuring that funded noncommercial broadcasters do not become propaganda organs for the government." *Id.*, at 384–385. Noting the diverse sources of funding for noncommercial stations, the protections built into the Public Broadcasting Act to ensure that noncommercial broadcasters remain free of governmental influence, and the requirements of the FCC's fairness doctrine which are designed to guard against one-sided presentation of controversial issues, the District Court concluded that the asserted fear of Government control was not sufficiently compelling to warrant § 399's restriction on speech. *Id.*, at 386. The court also rejected the contention that the restriction on editorializing as necessary to ensure that Government funding of noncommercial broadcast stations does not interfere with the balanced presentation of opinion on those stations. *Id.*, at 387. The FCC appealed from the District Court judgment

---

party suggests that the two sentences of § 399 are so inseverable that we may not consider the constitutionality of one without also reviewing the other. Indeed, as the Federal Communications Commission explained before the District Court, "[n]ew section 399 does more than reinforce the severability of the two provisions by setting them forth in separate sentences," it also confines the ban on editorializing to stations that receive CPB grants while extending a separate ban on political endorsements to all public stations. Defendant's Supplemental Memorandum on Amendment of Section 399, p. 4 (Sept. 15, 1981). We therefore express no view of the constitutionality of the second sentence in § 399. Cf. *First National Bank of Boston* v. *Bellotti*, 435 U. S. 765, 788, n. 26 (1978) (noting that "our consideration of a corporation's right to speak on issues of general public interest implies no comparable right in the quite different context of participation in a political campaign for election to public office"—a separate restriction not challenged in that case).

directly to this Court pursuant to 28 U. S. C. § 1252. We postponed consideration of the question of our jurisdiction to the merits, 460 U. S. 1010 (1983),[10] and we now affirm.

---

[10] Relying on our recent decision in *Griggs* v. *Provident Consumer Discount Co.*, 459 U. S. 56 (1982) *(per curiam)*, appellees contend that we lack jurisdiction because the FCC filed its notice of appeal while a motion to amend the District Court's judgment was still pending. Our decision in *Griggs*, however, rested squarely on the plain language of new Federal Rule of Appellate Procedure 4(a)(4), which specifically provides: "A notice of appeal filed before the disposition of [a Rule 59(e) motion] shall have no effect. A new notice of appeal must be filed within the prescribed time measured from the entry of the order disposing of the motion . . . ." See 459 U. S., at 61. Because this case comes to us directly from the District Court via 28 U. S. C. § 1252, the question whether the FCC's notice of appeal was effective to vest this Court with appellate jurisdiction turns not on Rule 4(a)(4), but rather on our own Rule 11.3. The express language of Rule 4(a)(4) found dispositive in *Griggs* has no direct equivalent in our Rule 11.3, which simply provides that "if a petition for rehearing is timely filed by any party . . . , the time for filing the notice of appeal . . . runs from the date of the denial of rehearing or the entry of a subsequent judgment." By its terms, therefore, our Rule does not determine whether a notice of appeal filed during the pendency of a motion to amend is ineffective to vest appellate jurisdiction in this Court. We have observed, however, that the filing of a petition for rehearing or a motion to amend or alter the judgment "suspend[s] the finality of the [original] judgment," thereby extending the time for filing a notice of appeal "until [the lower court's] denial of the motion . . . restores" that finality. *Communist Party of Indiana* v. *Whitcomb*, 414 U. S. 441, 445 (1974). At the same time, we have emphasized that the rule requiring suspension of a judgment's finality for purposes of appeal during the pendency of a postjudgment motion for reconsideration applies only when such a motion actually seeks an "alteration of the rights adjudicated" in the court's first judgment. *Department of Banking of Nebraska* v. *Pink*, 317 U. S. 264, 266 (1942) *(per curiam);* see also *FTC* v. *Minneapolis-Honeywell Regulator Co.*, 344 U. S. 206, 211 (1952) ("mere fact that a judgment previously entered is reentered or revised in an immaterial way does not toll the time within which review must be sought").

The FCC has brought this appeal pursuant to § 1252, which permits direct appeal to this Court from "an interlocutory or a final judgment . . . holding an Act of Congress unconstitutional." Section 1252 departs significantly from the general congressional policy of minimizing the manda-

374

II

We begin by considering the appropriate standard of review. The District Court acknowledged that our decisions

---

tory docket of this Court and reflects instead Congress' "unambiguou[s] mandat[e]" that we afford immediate direct review of all decisions that call into doubt the constitutionality of Acts of Congress. *McLucas* v. *DeChamplain,* 421 U. S. 21, 31 (1975). It is clear that the motion filed by the FCC following the entry of the District Court's August 6 order was directed not at the court's judgment holding § 399 unconstitutional, but rather at the wholly collateral issue of whether appellees were entitled to recover attorney's fees and costs. Prior to the court's decision, the question of attorney's fees had never been briefed or discussed by the parties; nevertheless, the court, acting *sua sponte,* included in its August 6 order an award of "reasonable attorneys' fees and costs" to appellees. Recognizing that the court's order had been entered in the absence of any application for fees and without benefit of briefing, the FCC sought, through its postjudgment motion, to restore the status quo ante with respect to the question of fees in order to allow time for full briefing. The District Court, in an order entered November 1, did precisely that by striking the award of attorney's fees from the August 6 order, and taking the question of fees under advisement.

As we recognized in *White* v. *New Hampshire Dept. of Employment Security,* 455 U. S. 445 (1982), an "award [of attorney's fees] is uniquely separable from the cause of action" that is settled by a court's judgment on the merits, and therefore a postjudgment request for attorney's fees is not considered a motion to amend or alter the judgment under Rule 59(e) of the Federal Rules of Civil Procedure. *Id.,* at 452. Since, as appellees concede, the FCC's motion in this case related solely to the "uniquely separable" question of attorney's fees and was in no way directed at the District Court's judgment "holding an Act of Congress unconstitutional," 28 U. S. C. § 1252, it is true here, as it was in *Department of Banking* v. *Pink, supra,* that the District Court was not asked to "alter its adjudication of the rights of the parties," and consequently the finality of the judgment which the FCC seeks to have reviewed "was never suspended." *Id.,* at 266. Accordingly, we think the time for filing the FCC's notice of appeal was properly calculated from the date the District Court's initial judgment was rendered, and its notice is therefore timely within 28 U. S. C. § 2101(a). A different result would frustrate the clear purpose of § 1252 to permit "prompt determination by the court of last resort of disputed questions of the constitutionality of acts of the Congress." H. R. Rep. No. 212, 75th Cong., 1st Sess., 2 (1937), since an appeal from a judgment

have generally applied a different First Amendment standard for broadcast regulation than in other areas, but after finding that no special characteristic of the broadcast media justified application of a less stringent standard in this case, it held that § 399 could survive constitutional scrutiny only if it served a "compelling" governmental interest. 547 F. Supp., at 384. Claiming that the court drew the wrong lessons from our prior decisions concerning broadcast regulation, the Government contends that a less demanding standard is required. It argues that Congress may, consistently with the First Amendment, exercise broad power to regulate broadcast speech because the medium of broadcasting is subject to the "special characteristic" of spectrum scarcity—a characteristic not shared by other media—which calls for more exacting regulation. This power, in the Government's view, includes authority to restrict the ability of all broadcasters, both commercial and noncommercial, to editorialize. Brief for Appellant 31. Moreover, given the unique role of noncommercial broadcasting as a source of "programming excellence and diversity that the commercial sector could not or would not produce," *id.*, at 33, Congress was entitled to impose special restrictions such as § 399 upon these stations. The Government concludes by urging that § 399 is an appropriate and essential means of furthering "important" governmental interests, *id.*, at 34, 35, 39, which leaves open the possibility that a wide variety of views on matters of public importance can be expressed through the medium of noncommercial educational broadcasting.

At first glance, of course, it would appear that the District Court applied the correct standard. Section 399 plainly operates to restrict the expression of editorial opinion on matters of public importance, and, as we have repeatedly explained, communication of this kind is entitled to the most

"holding an Act of Congress unconstitutional" would be delayed by collateral issues having no bearing whatever on the judgment from which the appeal is taken.

exacting degree of First Amendment protection. *E. g.,* *Minneapolis Star & Tribune Co.* v. *Minnesota Commissioner of Revenue,* 460 U. S. 575, 585 (1983); *First National Bank of Boston* v. *Bellotti,* 435 U. S. 765, 776–777 (1978); *Buckley* v. *Valeo,* 424 U. S. 1, 14 (1976); *Thornhill* v. *Alabama,* 310 U. S. 88, 101–102 (1940). Were a similar ban on editorializing applied to newspapers and magazines, we would not hesitate to strike it down as violative of the First Amendment. *E. g., Mills* v. *Alabama,* 384 U. S. 214 (1966). But, as the Government correctly notes, because broadcast regulation involves unique considerations, our cases have not followed precisely the same approach that we have applied to other media and have never gone so far as to demand that such regulations serve "compelling" governmental interests. At the same time, we think the Government's argument loses sight of concerns that are important in this area and thus misapprehends the essential meaning of our prior decisions concerning the reach of Congress' authority to regulate broadcast communication.

The fundamental principles that guide our evaluation of broadcast regulation are by now well established. First, we have long recognized that Congress, acting pursuant to the Commerce Clause, has power to regulate the use of this scarce and valuable national resource. The distinctive feature of Congress' efforts in this area has been to ensure through the regulatory oversight of the FCC that only those who satisfy the "public interest, convenience, and necessity" are granted a license to use radio and television broadcast frequencies. 47 U. S. C. § 309(a).[11]

---

[11] See *FCC* v. *National Citizens Committee for Broadcasting,* 436 U. S. 775, 799–800 (1978); *Columbia Broadcasting System, Inc.* v. *Democratic National Committee,* 412 U. S. 94, 101–102 (1973); *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 387–390 (1969); *National Broadcasting Co.* v. *United States,* 319 U. S. 190, 216 (1943); *Federal Radio Comm'n* v. *Nelson Bros. Bond & Mortgage Co.,* 289 U.S. 266, 282 (1933).

The prevailing rationale for broadcast regulation based on spectrum scarcity has come under increasing criticism in recent years. Critics, including the incumbent Chairman of the FCC, charge that with the advent

Second, Congress may, in the exercise of this power, seek to assure that the public receives through this medium a balanced presentation of information on issues of public importance that otherwise might not be addressed if control of the medium were left entirely in the hands of those who own and operate broadcasting stations. Although such governmental regulation has never been allowed with respect to the print media, *Miami Herald Publishing Co.* v. *Tornillo*, 418 U. S. 241 (1974), we have recognized that "differences in the characteristics of new media justify differences in the First Amendment standards applied to them." *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 386 (1969). The fundamental distinguishing characteristic of the new medium of broadcasting that, in our view, has required some adjustment in First Amendment analysis is that "[b]roadcast frequencies are a scarce resource [that] must be portioned out among applicants." *Columbia Broadcasting System, Inc.* v. *Democratic National Committee*, 412 U. S. 94, 101 (1973). Thus, our cases have taught that, given spectrum scarcity, those who are granted a license to broadcast must serve in a sense as fiduciaries for the public by presenting "those views and voices which are representative of [their] community and which would otherwise, by necessity, be barred from the airwaves." *Red Lion, supra*, at 389. As we observed in that case, because "[i]t is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, . . . the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences [through the medium of broadcasting]

of cable and satellite television technology, communities now have access to such a wide variety of stations that the scarcity doctrine is obsolete. See, *e. g.*, Fowler & Brenner, A Marketplace Approach to Broadcast Regulation, 60 Texas L. Rev. 207, 221–226 (1982). We are not prepared, however, to reconsider our longstanding approach without some signal from Congress or the FCC that technological developments have advanced so far that some revision of the system of broadcast regulation may be required.

is crucial here [and it] may not constitutionally be abridged either by Congress or by the FCC." 395 U. S., at 390.

Finally, although the Government's interest in ensuring balanced coverage of public issues is plainly both important and substantial, we have, at the same time, made clear that broadcasters are engaged in a vital and independent form of communicative activity. As a result, the First Amendment must inform and give shape to the manner in which Congress exercises its regulatory power in this area. Unlike common carriers, broadcasters are "entitled under the First Amendment to exercise 'the widest journalistic freedom consistent with their public [duties].'" *CBS, Inc.* v. *FCC,* 453 U. S. 367, 395 (1981) (quoting *Columbia Broadcasting System, Inc.* v. *Democratic National Committee, supra,* at 110). See also *FCC* v. *Midwest Video Corp.,* 440 U. S. 689, 703 (1979). Indeed, if the public's interest in receiving a balanced presentation of views is to be fully served, we must necessarily rely in large part upon the editorial initiative and judgment of the broadcasters who bear the public trust. See *Columbia Broadcasting System, Inc.* v. *Democratic National Committee, supra,* at 124–127.

Our prior cases illustrate these principles. In *Red Lion,* for example, we upheld the FCC's "fairness doctrine"—which requires broadcasters to provide adequate coverage of public issues and to ensure that this coverage fairly and accurately reflects the opposing views—because the doctrine advanced the substantial governmental interest in ensuring balanced presentations of views in this limited medium and yet posed no threat that a "broadcaster [would be denied permission] to carry a particular program or to publish his own views." 395 U. S., at 396.[12] Similarly, in *CBS, Inc.* v. *FCC, supra,* the

---

[12] We note that the FCC, observing that "[i]f any substantial possibility exists that the [fairness doctrine] rules have impeded, rather than furthered, First Amendment objectives, repeal may be warranted on that ground alone," has tentatively concluded that the rules, by effectively chill-

Court upheld the right of access for federal candidates imposed by § 312(a)(7) of the Communications Act both because that provision "makes a significant contribution to freedom of expression by enhancing the ability of candidates to present, and the public to receive, information necessary for the effective operation of the democratic process," *id.*, at 396, and because it defined a sufficiently *"limited* right of 'reasonable' access" so that "the discretion of broadcasters to present their views on any issue or to carry any particular type of programming" was not impaired. *Id.*, at 396–397 (emphasis in original). Finally, in *Columbia Broadcasting System, Inc.* v. *Democratic National Committee, supra,* the Court affirmed the FCC's refusal to require broadcast licensees to accept all paid political advertisements. Although it was argued that such a requirement would serve the public's First Amendment interest in receiving additional views on public issues, the Court rejected this approach, finding that such a requirement would tend to transform broadcasters into common carriers and would intrude unnecessarily upon the editorial discretion of broadcasters. *Id.*, at 123–125. The FCC's ruling, therefore, helped to advance the important purposes of the Communications Act, grounded in the First Amendment, of preserving the right of broadcasters to exercise "the widest journalistic freedom consistent with [their] public obligations," and of guarding against "the risk of an enlarge-

---

ing speech, do not serve the public interest, and has therefore proposed to repeal them. Notice of Proposed Rulemaking In re Repeal or Modification of the Personal Attack and Political Editorial Rules, 48 Fed. Reg. 28298, 28301 (1983). Of course, the Commission may, in the exercise of its discretion, decide to modify or abandon these rules, and we express no view on the legality of either course. As we recognized in *Red Lion,* however, were it to be shown by the Commission that the fairness doctrine "[has] the net effect of reducing rather than enhancing" speech, we would then be forced to reconsider the constitutional basis of our decision in that case. 395 U. S., at 393.

ment of Government control over the content of broadcast discussion of public issues." *Id.*, at 110, 126.[13]

Thus, although the broadcasting industry plainly operates under restraints not imposed upon other media, the thrust of these restrictions has generally been to secure the public's First Amendment interest in receiving a balanced presentation of views on diverse matters of public concern. As a result of these restrictions, of course, the absolute freedom to advocate one's own positions without also presenting opposing viewpoints—a freedom enjoyed, for example, by newspaper publishers and soapbox orators—is denied to broadcasters. But, as our cases attest, these restrictions have been upheld only when we were satisfied that the restriction is narrowly tailored to further a substantial governmental interest, such as ensuring adequate and balanced coverage of public issues, *e. g.*, *Red Lion*, 395 U. S., at 377. See also *CBS, Inc.* v. *FCC, supra*, at 396–397; *Columbia Broadcasting System, Inc.* v. *Democratic National Committee*, 412 U. S., at 110–111; *Red Lion, supra*, at 396. Making that

---

[13] This Court's decision in *FCC* v. *Pacifica Foundation*, 438 U. S. 726 (1978), upholding an exercise of the Commission's authority to regulate broadcasts containing "indecent" language as applied to a particular afternoon broadcast of a George Carlin monologue, is consistent with the approach taken in our other broadcast cases. There, the Court focused on certain physical characteristics of broadcasting—specifically, that the medium's uniquely pervasive presence renders impossible any prior warning for those listeners who may be offended by indecent language, and, second, that the ease with which children may gain access to the medium, especially during daytime hours, creates a substantial risk that they may be exposed to such offensive expression without parental supervision. *Id.*, at 748–749. The governmental interest in reduction of those risks through Commission regulation of the timing and character of such "indecent broadcasting" was thought sufficiently substantial to outweigh the broadcaster's First Amendment interest in controlling the presentation of its programming. *Id.*, at 750. In this case, by contrast, we are faced not with indecent expression, but rather with expression that is at the core of First Amendment protections, and no claim is made by the Government that the expression of editorial opinion by noncommercial stations will create a substantial "nuisance" of the kind addressed in *FCC* v. *Pacifica Foundation*.

judgment requires a critical examination of the interests of the public and broadcasters in light of the particular circumstances of each case. *E. g., FCC* v. *Pacifica Foundation,* 438 U. S. 726 (1978).

## III

We turn now to consider whether the restraint imposed by § 399 satisfies the requirements established by our prior cases for permissible broadcast regulation. Before assessing the Government's proffered justifications for the statute, however, two central features of the ban against editorializing must be examined, since they help to illuminate the importance of the First Amendment interests at stake in this case.

## A

First, the restriction imposed by § 399 is specifically directed at a form of speech—namely, the expression of editorial opinion—that lies at the heart of First Amendment protection. In construing the reach of the statute, the FCC has explained that "although the use of noncommercial educational broadcast facilities by licensees, their management or those speaking on their behalf for the propagation of the licensee's own views on public issues is therefore not to be permitted, such prohibition should not be construed to inhibit any *other* presentations on controversial issues of public importance." *Accuracy in Media, Inc.,* 45 F. C. C. 2d 297, 302 (1973) (emphasis added). The Commission's interpretation of § 399 simply highlights the fact that what the statute forecloses is the expression of editorial opinion on "controversial issues of public importance." As we recently reiterated in *NAACP* v. *Claiborne Hardware Co.,* 458 U. S. 886 (1982), "expression on public issues 'has always rested on the highest rung of the hierarchy of First Amendment values.'" *Id.,* at 913 (quoting *Carey* v. *Brown,* 447 U. S. 455, 467 (1980)). And we have emphasized:

"The freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to

discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment. . . . Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." *Thornhill* v. *Alabama*, 310 U. S., at 101–102.

The editorial has traditionally played precisely this role by informing and arousing the public, and by criticizing and cajoling those who hold government office in order to help launch new solutions to the problems of the time. Preserving the free expression of editorial opinion, therefore, is part and parcel of "a profound national commitment . . . that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 270 (1964). As we recognized in *Mills* v. *Alabama*, 384 U. S. 214 (1966), the special place of the editorial in our First Amendment jurisprudence simply reflects the fact that the press, of which the broadcasting industry is indisputably a part, *United States* v. *Paramount Pictures, Inc.*, 334 U. S. 131, 166 (1948), carries out a historic, dual responsibility in our society of reporting information and of bringing critical judgment to bear on public affairs. Indeed, the pivotal importance of editorializing as a means of satisfying the public's interest in receiving a wide variety of ideas and views through the medium of broadcasting has long been recognized by the FCC; the Commission has for the past 35 years actively encouraged commercial broadcast licensees to include editorials on public affairs in their programming.[14]

---

[14] In 1949, finding that "programs in which the licensee's personal opinions are expressed are [not] intrinsically more or less subject to abuse than any other program devoted to public issues," the FCC concluded that overt licensee editorializing, so long as "it is exercised in conformity with the paramount right of the public to hear a reasonably balanced presentation of all responsible viewpoints" is "consistent with the licensee's duty to

Because § 399 appears to restrict precisely that form of speech which the Framers of the Bill of Rights were most anxious to protect—speech that is "indispensable to the discovery and spread of political truth"—we must be especially careful in weighing the interests that are asserted in support of this restriction and in assessing the precision with which the ban is crafted. *Whitney* v. *California*, 274 U. S. 357, 375 (1927) (Brandeis, J., concurring).

Second, the scope of § 399's ban is defined solely on the basis of the content of the suppressed speech. A wide variety of noneditorial speech "by licensees, their management or those speaking on their behalf," *Accuracy in Media, Inc.*, 45 F. C. C. 2d, at 302, is plainly not prohibited by § 399. Examples of such permissible forms of speech include daily announcements of the station's program schedule or over-the-air appeals for contributions from listeners. Consequently, in order to determine whether a particular statement by station management constitutes an "editorial" proscribed by § 399, enforcement authorities must necessarily examine the content of the message that is conveyed to determine whether the views expressed concern "controversial issues of public importance." *Ibid.*

As JUSTICE STEVENS observed in *Consolidated Edison Co.* v. *Public Service Comm'n of N. Y.*, 447 U. S. 530 (1980), however: "A regulation of speech that is motivated by nothing

___

operate in the public interest." *Editorializing by Broadcast Licensees*, 13 F. C. C. 1246, 1253, 1258 (1949). At the time, of course, this decision applied with equal force to both noncommercial educational licensees and commercial stations. The FCC has since underscored its view that editorializing by broadcast licensees serves the public interest by identifying editorial programming as one of 14 "major elements usually necessary to meet the public interest, needs and desires of the community." FCC Programming Statement, 25 Fed. Reg. 7295 (1960). The Commission has regularly enforced this policy by considering a licensee's editorializing practices in license renewal proceedings. See, *e. g.*, *Greater Boston Television Corp.* v. *FCC*, 143 U. S. App. D. C. 383, 402, 444 F. 2d 841, 860 (1970); *Evening Star Broadcasting Co.*, 27 F. C. C. 2d 316, 332 (1971); *RKO General, Inc.*, 44 F. C. C. 2d 149, 219 (1969).

more than a desire to curtail expression of a particular point of view on controversial issues of general interest is the purest example of a 'law . . . abridging the freedom of speech, or of the press.' A regulation that denies one group of persons the right to address a selected audience on 'controversial issues of public policy' is plainly such a regulation." *Id.*, at 546 (opinion concurring in judgment); accord, *id.*, at 537–540 (majority opinion). Section 399 is just such a regulation, for it singles out noncommercial broadcasters and denies them the right to address their chosen audience on matters of public importance. Thus, in enacting § 399 Congress appears to have sought, in much the same way that the New York Public Service Commission had attempted through the regulation of utility company bill inserts struck down in *Consolidated Edison*, to limit discussion of controversial topics and thus to shape the agenda for public debate. Since, as we observed in *Consolidated Edison*, "[t]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic," *id.*, at 537, we must be particularly wary in assessing § 399 to determine whether it reflects an impermissible attempt "to allow a government [to] control . . . the search for political truth." *Id.*, at 538.[15]

### B

In seeking to defend the prohibition on editorializing imposed by § 399, the Government urges that the statute was aimed at preventing two principal threats to the overall success of the Public Broadcasting Act of 1967. According to this argument, the ban was necessary, first, to protect noncommercial educational broadcasting stations from being coerced, as a result of federal financing, into becoming vehi-

---

[15] See also *Bolger* v. *Youngs Drug Products Corp.*, 463 U. S. 60, 65 (1983); *Carey* v. *Brown*, 447 U.S. 455, 462–463 (1980); *First National Bank of Boston* v. *Bellotti*, 435 U. S., at 784–785; *Police Department of Chicago* v. *Mosley*, 408 U.S. 92, 95–96 (1972).

cles for Government propagandizing or the objects of governmental influence; and, second, to keep these stations from becoming convenient targets for capture by private interest groups wishing to express their own partisan viewpoints.[16] By seeking to safeguard the public's right to a balanced presentation of public issues through the prevention of either governmental or private bias, these objectives are, of course, broadly consistent with the goals identified in our earlier broadcast regulation cases. But, in sharp contrast to the restrictions upheld in *Red Lion* or in *CBS, Inc.* v. *FCC*, which left room for editorial discretion and simply required broadcast editors to grant others access to the microphone, § 399 directly prohibits the broadcaster from speaking out on public issues even in a balanced and fair manner. The Government insists, however, that the hazards posed in the "special" circumstances of noncommercial

---

[16] The Government also contends that § 399 is intended to prevent the use of taxpayer moneys to promote private views with which taxpayers may disagree. This argument is readily answered by our decision in *Buckley* v. *Valeo*, 424 U. S. 1, 90–93 (1976) *(per curiam)*. As we explained in that case, virtually every congressional appropriation will to some extent involve a use of public money as to which some taxpayers may object. *Id.*, at 91–92. Nevertheless, this does not mean that those taxpayers have a constitutionally protected right to enjoin such expenditures. Nor can this interest be invoked to justify a congressional decision to suppress speech. And, unlike *Wooley* v. *Maynard*, 430 U. S. 705 (1977), this is not a case in which an individual taxpayer is forced in his daily life to identify with particular views expressed by educational broadcasting stations. Even if this were a serious interest, it is belied by the underinclusiveness of § 399. The Government concedes—indeed it insists—that all sorts of controversial speech are subsidized by the 1967 Act, and yet out of all of this potentially objectionable speech, only the expression of editorial opinion by local stations is selected for suppression. If angry taxpayers were really the central, animating concern of Congress when it passed the 1967 Act, then § 399 does not go far enough in suppressing controversial speech in this medium. That the provision is so unrelated to this asserted purpose suggests that the Government's interest is not substantial. Cf. *Buckley* v. *Valeo*, *supra*, at 45; *First National Bank of Boston* v. *Bellotti*, *supra*, at 793.

educational broadcasting are so great that § 399 is an indispensable means of preserving the public's First Amendment interests. We disagree.

(1)

When Congress first decided to provide financial support for the expansion and development of noncommercial educational stations, all concerned agreed that this step posed some risk that these traditionally independent stations might be pressured into becoming forums devoted solely to programming and views that were acceptable to the Federal Government. That Congress was alert to these dangers cannot be doubted. It sought through the Public Broadcasting Act to fashion a system that would provide local stations with sufficient funds to foster their growth and development while preserving their tradition of autonomy and community-orientation.[17] A cardinal objective of the Act was the es-

---

[17] The Senate Report concerning the Act, for example, explained:

"There is general agreement that for the time being, Federal financial assistance is required to provide the resources necessary for quality programs. It is also recognized that this assistance should in no way involve the Government in programming or program judgments. An independent entity supported by Federal funds is required to provide programs free of political pressures. The Corporation for Public Broadcasting, a nonprofit private corporation, . . . provides such an entity." S. Rep. No. 222, 90th Cong., 1st Sess., 4 (1967).

"Your committee has heard considerable discussion about the fear of Government control or interference in programming if [the Act] is enacted. We wish to state in the strongest terms possible that it is our intention that local stations be absolutely free to determine for themselves what they should or should not broadcast." Id., at 11. See also The Public Television Act of 1967: Hearings on S. 1160 before the Subcommittee on Communications of the Senate Committee on Commerce, 90th Cong., 1st Sess., 9 (1967) (remarks of Sen. Pastore).

The House Report echoed the same concerns:

"Every witness who discussed the operation of the Corporation agreed that funds for programs should not be provided directly by the Federal Government. It was generally agreed that a nonprofit Corporation, directed by a Board of Directors, none of whom will be Government

tablishment of a private corporation that would "facilitate the development of educational radio and television broadcasting and . . . afford maximum protection to such broadcasting from extraneous interference and control." 47 U. S. C. § 396(a)(6) (1976 ed.).

The intended role of § 399 in achieving these purposes, however, is not as clear. The provision finds no antecedent in the Carnegie report, which generally provided the model for most other aspects of the Act. It was not part of the administration's original legislative proposal. And it was not included in the original version of the Act passed by the Senate. The provision found its way into the Act only as a result of an amendment in the House. Indeed, it appears that, as the House Committee Report frankly admits, § 399 was added not because Congress thought it was essential to preserving the autonomy and vitality of local stations, but rather "[o]ut of an abundance of caution." H. R. Rep. No. 572, 90th Cong., 1st Sess., 20 (1967).[18]

---

employees, will provide the most effective insulation from Government control or influence over the expenditure of funds." H. R. Rep. No. 572, 90th Cong., 1st Sess., 15 (1967).

"[L]ocal stations shall retain both the opportunity and responsibility for broadcasting programs they feel best serve their communities. Similarly, the local station alone will make the decision whether or not to participate in any interconnection arrangements . . . ." Id., at 18.

[18] The legislative history surrounding § 399 also suggests that a variety of reasons lay behind the decision to include it as part of the Act. Although some supporters of § 399 plainly were concerned that permitting editorializing might create a risk that noncommercial stations would be subjected to undue governmental influence and thereby become vehicles for governmental propaganda, see 113 Cong. Rec. 26383 (1967) (remarks of Rep. Staggers), other supporters of the provision appear to have been more concerned with preventing the possibility that these stations would criticize Government officials. Representative Springer, the provision's chief sponsor and the ranking minority member of the House Committee that reported out the bill containing § 399, explained that his concerns were due at least in part to the fact that "[t]here are some of us who have very strong feelings because they have been editorialized against." Hearings

More importantly, an examination of both the overall legislative scheme established by the 1967 Act and the character of public broadcasting demonstrates that the interest asserted by the Government is not substantially advanced by § 399. First, to the extent that federal financial support creates a risk that stations will lose their independence through the bewitching power of governmental largesse, the elaborate structure established by the Public Broadcasting Act

---

on H. R. 6736 and S. 1160 before the House Committee on Interstate and Foreign Commerce, 90th Cong., 1st Sess., 641 (1967) (House Hearings). See also 113 Cong. Rec. 26391 (1967) (remarks of Rep. Joelson). Indeed, during hearings on the bill, the Committee heard a variety of views on the question of editorializing by noncommercial educational stations. Some witnesses felt that editorials of any kind would be inappropriate, see, e. g., House Hearings, at 513–514 (remarks of William Harley, President, National Association of Educational Broadcasters), while others took a different view, explaining that although specific endorsements of political candidates would be inappropriate, editorials concerning civic affairs and other matters of public concern would be an important part of responsible educational broadcasting, see, e. g., id., at 391–392 (remarks of McGeorge Bundy, President, Ford Foundation); id., at 640–642 (remarks of Dr. Samuel Gould, Joint Council on Educational Telecommunications). After the House passed H. R. 6736, the Senate, disagreeing with the addition of § 399, requested a Conference and only receded from its disagreement "when it was explained that the prohibition . . . was limited to providing that no noncommercial educational broadcast station may broadcast editorials representing the opinion of the management of such station . . . [and that] these provisions are not intended to preclude balanced, fair, and objective presentations of controversial issues . . . ." H. R. Conf. Rep. No. 794, 90th Cong., 1st Sess., 12 (1967).

Of course, as the Government points out, Congress has consistently retained the basic proscription on editorializing in § 399, despite periodic reconsiderations and modifications of the Act in 1973, 1978, and 1981. Brief for Appellant 25–27; see also n. 7, supra. A reviewing court may not easily set aside such a considered congressional judgment. At the same time, "[d]eference to a legislative finding cannot limit judicial inquiry when First Amendment rights are at stake. . . . Were it otherwise, the scope of freedom of speech and of the press would be subject to legislative definition and the function of the First Amendment as a check on legislative power would be nullified." Landmark Communications, Inc. v. Virginia, 435 U. S. 829, 843–844 (1978).

already operates to insulate local stations from governmental interference. Congress not only mandated that the new Corporation for Public Broadcasting would have a private, bipartisan structure, see §§ 396(c)–(f), but also imposed a variety of important limitations on its powers. The Corporation was prohibited from owning or operating any station, § 396(g)(3), it was required to adhere strictly to a standard of "objectivity and balance" in disbursing federal funds to local stations, § 396(g)(1)(A), and it was prohibited from contributing to or otherwise supporting any candidate for office, § 396(f)(3).

The Act also established a second layer of protections which serve to protect the stations from governmental coercion and interference. Thus, in addition to requiring the Corporation to operate so as to "assure the maximum freedom [of local stations] from interference with or control of program content or other activities," § 396(g)(1)(D), the Act expressly forbids "any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over educational television or radio broadcasting, or over the Corporation or any of its grantees or contractors . . . ," § 398(a) (1976 ed.). Subsequent amendments to the Act have confirmed Congress' commitment to the principle that because local stations are the "bedrock of the system," their independence from governmental interference and control must be fully guaranteed. These amendments have provided long-term appropriations authority for public broadcasting, rather than allowing funding to depend upon yearly appropriations, see § 396(k)(1)(C), as amended, Pub. L. 97–35, Title XII, § 1227, 95 Stat. 727; have strictly defined the percentage of appropriated funds that must be disbursed by the Corporation to local stations, § 396(k)(3) (A)–(B); and have defined objective criteria under which local television and radio stations receive basic grants from the Corporation to be used at the discretion of the station. §§ 396(k)(6)(A)–(B), 396(k)(7). The principal thrust of the amendments, therefore, has been to assure long-term

appropriations for the Corporation and, more importantly, to insist that it pass specified portions of these funds directly through to local stations to give them greater autonomy in defining the uses to which those funds should be put. Thus, in sharp contrast to § 399, the unifying theme of these various statutory provisions is that they substantially reduce the risk of governmental interference with the editorial judgments of local stations without restricting those stations' ability to speak on matters of public concern.[19]

Even if these statutory protections were thought insufficient to the task, however, suppressing the particular category of speech restricted by § 399 is simply not likely, given the character of the public broadcasting system, to reduce substantially the risk that the Federal Government will seek to influence or put pressure on local stations. An underlying supposition of the Government's argument in this regard is that individual noncommercial stations are likely to speak so forcefully on particular issues that Congress, the ultimate source of the stations' federal funding, will be tempted to retaliate against these individual stations by restricting appropriations for all of public broadcasting. But, as the District Court recognized, the character of public broadcast-

---

[19] Furthermore, the risk that federal coercion or influence will be brought to bear against local stations as a result of federal financing is considerably attenuated by the fact that CPB grants account for only a portion of total public broadcasting income. CPB, Public Broadcasting Income: Fiscal Year 1982, Table 2 (Final Report, Dec. 1983) (noting that federal funds account for 23.4% of total income for all public broadcasting stations). The vast majority of financial support comes instead from state and local governments, as well as a wide variety of private sources, including foundations, businesses, and individual contributions; indeed, as the CPB recently noted, "[t]he diversity of support in America for public broadcasting is remarkable," CPB, 1982 Annual Report 2 (1982). Given this diversity of funding sources and the decentralized manner in which funds are secured, the threat that improper federal influence will be exerted over local stations is not so pressing as to require the total suppression of editorial speech by these stations.

ing suggests that such a risk is speculative at best. There are literally hundreds of public radio and television stations in communities scattered throughout the United States and its territories, see CPB, 1983–84 Public Broadcasting Directory 20–50, 66–86 (Sept. 1983). Given that central fact, it seems reasonable to infer that the editorial voices of these stations will prove to be as distinctive, varied, and idiosyncratic as the various communities they represent. More importantly, the editorial focus of any particular station can fairly be expected to focus largely on issues affecting only its community.[20] Accordingly, absent some showing by the Government to the contrary, the risk that local editorializing will place all of public broadcasting in jeopardy is not sufficiently pressing to warrant § 399's broad suppression of speech.

Indeed, what is far more likely than local station editorials to pose the kinds of dangers hypothesized by the Government are the wide variety of programs addressing controversial issues produced, often with substantial CPB funding, for national distribution to local stations. Such programs truly have the potential to reach a large audience and, because of the critical commentary they contain, to have the kind of genuine national impact that might trigger a congressional response or kindle governmental resentment. The ban imposed by § 399, however, is plainly not directed at the potentially controversial content of such programs; it is, instead, leveled solely at the expression of editorial opinion by local station management, a form of expression that is far more likely to be aimed at a smaller local audience, to have less

---

[20] This likelihood is enhanced with respect to public stations because they are required to establish community advisory boards which must reasonably reflect the "diverse needs and interests of the communities served by such station[s]." § 396(k)(9)(A). For a review of sample topics of broadcast editorializing, see Fang & Whelan, Survey of Television Editorials and Ombudsman Segments, 17 J. Broadcasting 363 (1973); see also E. Routt, Dimensions of Broadcast Editorializing (1974).

national impact, and to be confined to local issues. In contrast, the Act imposes no substantive restrictions, other than normal requirements of balance and fairness, on those who produce nationally distributed programs. Indeed, the Act is designed in part to encourage and sponsor the production of such programs and to allow each station to decide for itself whether to accept such programs for local broadcast.[21]

Furthermore, the manifest imprecision of the ban imposed by § 399 reveals that its proscription is not sufficiently tailored to the harms it seeks to prevent to justify its substantial interference with broadcasters' speech. Section

---

[21] Congressional experience with the Act following its passage in 1967 has reaffirmed its commitment to preserving broad editorial discretion for local stations in determining the content of their schedules and programming. This experience also suggests that those critical reactions to public broadcasting that have occurred have focused not on the exercise of such editorial judgments by local stations but rather on controversial programming produced for national distribution, which has included critical commentary on public affairs. In 1972, claiming that the centralization of program production was usurping the role of local stations, then President Nixon vetoed a bill establishing 2-year appropriations authority for CPB funding. See Carnegie II, at 41–43. In addition, the administration was critical of certain of the best known nationally distributed public affairs programs, such as "Bill Moyer's Journal" and "Washington Week in Review," which were regarded by some as too controversial. See Canby, The First Amendment and the State as Editor: Implications for Public Broadcasting, 52 Texas L. Rev. 1123, 1156–1157 (1974). These events prompted Congress to undertake its first thorough review of the public broadcasting system since the enactment of the Public Broadcasting Act. See S. Rep. No. 93–123, p. 12 (1973). The result of that review was a firm congressional commitment to developing long-range financing for public broadcasting to "provide adequate insulation against Government interference," id., at 14, and to ensuring an "increase [in] both the percentage and amount of unrestricted support available to public television stations" "[in order to ensure] strong local programming made possible by a predictable level of community service [i. e., unrestricted] grants." H. R. Rep. No. 93–324, pp. 7, 9 (1973). These themes have been carried forward in subsequent amendments to the Act, see Pub. L. 95–567, § 307, 92 Stat. 2415, and Pub. L. 97–35, § 1227, 95 Stat. 727.

399 includes within its grip a potentially infinite variety of speech, most of which would not be related in any way to governmental affairs, political candidacies, or elections. Indeed, the breadth of editorial commentary is as wide as human imagination permits. But the Government never explains how, say, an editorial by local station management urging improvements in a town's parks or museums will so infuriate Congress or other federal officials that the future of public broadcasting will be imperiled unless such editorials are suppressed. Nor is it explained how the suppression of editorials alone serves to reduce the risk of governmental retaliation and interference when it is clear that station management is fully able to broadcast controversial views so long as such views are not labeled as its own. See *infra*, at 396, and n. 25.

The Government appears to recognize these flaws in § 399, because it focuses instead on the suggestion that the source of governmental influence may well be state and local governments, many of which have established public broadcasting commissions that own and operate local noncommercial educational stations.[22] The ban on editorializing is all the more necessary with respect to these stations, the argument runs, because the management of such stations will be especially likely to broadcast only editorials that are favorable to the state or local authorities that hold the purse strings. The Government's argument, however, proves too much. First, § 399's ban applies to the many private noncommercial community organizations that own and operate stations that

---

[22] As the Government points out in its brief, at least two-thirds of the public television broadcasting stations in operation are licensed to (a) state public broadcasting authorities or commissions, in which commission members are often appointed by the governor with the advice and consent of the state legislature, (b) state universities or educational commissions, or (c) local school boards or municipal authorities. Brief for Appellant 20, nn. 43, 44; see also CPB, 1983–84 CPB Public Broadcasting Directory 5–8, 66–86 (Sept. 1983).

are not controlled in any way by state or local government. Second, the legislative history of the Public Broadcasting Act clearly indicates that Congress was concerned with "assur[ing] complete freedom from any *Federal Government influence.*" The Public Television Act of 1967: Hearings on S. 1160 before the Subcommittee on Communications of the Senate Committee on Commerce, 90th Cong., 1st Sess., 9 (1967) (remarks of Sen. Pastore) (emphasis added).[23] Consistently with this concern, Congress refused to create any federally owned stations and it expressly forbade the CPB to own or operate any television or radio stations, § 396(g)(3). By contrast, although Congress was clearly aware in 1967 that many noncommercial educational stations were owned by state and local governments, it did not hesitate to extend federal assistance to such stations, it imposed no special requirements to restrict state or local control over these stations, and, indeed, it ensured through the structure of the Act that these stations would be as insulated from federal interference as the wholly private stations.[24]

---

[23] See also Hearings on S. 1160, at 93 (remarks of FCC Chairman Hyde); Special Message to the Congress: "Education and Health in America," 1 Public Papers of the Presidents, Lyndon B. Johnson, Feb. 28, 1967, p. 250 (1967) ("Non-commercial television and radio in America, even though supported by federal funds, must be absolutely free from any federal government interference over programming"); see also 113 Cong. Rec. 26384 (1967) (remarks of Rep. Staggers); H. R. Rep. No. 572, 90th Cong., 1st Sess., 18–19 (1967); S. Rep. No. 222, 90th Cong., 1st Sess., 7–8, 11 (1967).

[24] We note in this regard that in 1977 the administration, observing that § 399's ban appeared to "mak[e] sense for stations licensed to a State or local government instrumentalit[ies]" but not for nongovernmental licensees, proposed that the statute be amended to permit editorializing by all stations not licensed to governmental entities. President's Message on Public Broadcasting (Oct. 6, 1977), reprinted in H. R. Rep. No. 95–1178, p. 9 (1978). The House, however, went further and passed H. R. 12605, which, among other things, amended § 399 by deleting entirely the ban on editorializing while retaining the ban on political endorsements. 124 Cong. Rec. 19937 (1978); see also H. R. Rep. No. 95–1178, *supra,* at 31. The Senate then passed an amended version of H. R. 12605, which retained § 399 in its original form. 124 Cong. Rec. 30081 (1978). At conference,

Finally, although the Government certainly has a substantial interest in ensuring that the audiences of noncommercial stations will not be led to think that the broadcaster's editorials reflect the official view of the Government, this interest can be fully satisfied by less restrictive means that are readily available. To address this important concern, Congress could simply require public broadcasting stations to broadcast a disclaimer every time they editorialize which would state that the editorial represents only the view of the station's management and does not in any way represent the views of the Federal Government or any of the station's other sources of funding. Such a disclaimer—similar to those often used in commercial and noncommercial programming of a controversial nature—would effectively and directly communicate to the audience that the editorial reflected only the views of the station rather than those of the Government. Furthermore, such disclaimers would have the virtue of clarifying the responses that might be made under the fairness doctrine by opponents of the station's position, since those opponents would know with certainty that they were responding only to the station's views and not in any sense to the Government's position.

In sum, § 399's broad ban on all editorializing by every station that receives CPB funds far exceeds what is necessary to protect against the risk of governmental interference or to prevent the public from assuming that editorials by public broadcasting stations represent the official view of government. The regulation impermissibly sweeps within its prohibition a wide range of speech by wholly private stations on topics that do not take a directly partisan stand or that have nothing whatever to do with federal, state, or local government.

---

the House receded from its disagreement and § 399 was retained. H. R. Conf. Rep. No. 95–1774, p. 35 (1978). Whether a prohibition on editorializing restricted to the licensees of state and local governmental entities would pass constitutional muster is a question we need not decide.

(2)

Assuming that the Government's second asserted interest in preventing noncommercial stations from becoming a "privileged outlet for the political and ideological opinions of station owners and managers," Brief for Appellant 34, is legitimate, the substantiality of this asserted interest is dubious. The patent overinclusiveness and underinclusiveness of § 399's ban "undermines the likelihood of a genuine [governmental] interest" in preventing private groups from propagating their own views via public broadcasting. *First National Bank of Boston* v. *Bellotti*, 435 U. S., at 793. If it is true, as the Government contends, that noncommercial stations remain free, despite § 399, to broadcast a wide variety of controversial views through their power to control program selection, to select which persons will be interviewed, and to determine how news reports will be presented, Brief for Appellant 41, then it seems doubtful that § 399 can fairly be said to advance any genuinely substantial governmental interest in keeping controversial or partisan opinions from being aired by noncommercial stations. Indeed, since the very same opinions that cannot be expressed by the station's management may be aired so long as they are communicated by a commentator or by a guest appearing at the invitation of the station during an interview, *ibid.;* see also *Accuracy in Media*, 45 F. C. C. 2d, at 302, § 399 clearly "provides only ineffective or remote support for the government's purpose." *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of N. Y.*, 447 U. S. 557, 564 (1980). Cf. *Buckley* v. *Valeo*, 424 U. S., at 45; *First National Bank of Boston* v. *Bellotti, supra*, at 793.[25]

---

[25] When it determined in 1949 that broadcast editorializing served the public interest, the FCC recognized precisely this fact: "It is clear that the licensee's authority to determine the specific programs to be broadcast over his station gives him an opportunity . . . to insure that his personal viewpoint on any particular issue is presented in his station's broadcasts,

In short, § 399 does not prevent the use of noncommercial stations for the presentation of partisan views on controversial matters; instead, it merely bars a station from specifically communicating such views on its own behalf or on behalf of its management. If the vigorous expression of controversial opinions is, as the Government assures us, affirmatively encouraged by the Act, and if local licensees are permitted under the Act to exercise editorial control over the selection of programs, controversial or otherwise, that are aired on their stations, then § 399 accomplishes only one thing—the suppression of editorial speech by station management. It does virtually nothing, however, to reduce the risk that public stations will serve solely as outlets for expression of narrow partisan views. What we said in *Columbia Broadcasting System, Inc.* v. *Democratic National Committee* applies, therefore, with equal force here: the "sacrifice [of] First Amendment protections for so speculative a gain is not warranted . . . ." 412 U. S., at 127.

Finally, the public's interest in preventing public broadcasting stations from becoming forums for lopsided presentations of narrow partisan positions is already secured by

---

whether or not these views are expressly identified with the licensee." *Editorializing by Broadcast Licensees*, 13 F. C. C., at 1252. The Commission nonetheless rejected the contention that overt advocacy by licensees would be contrary to the public interest. Instead, the FCC found that "these fears are largely misdirected . . . they stem from a confusion of the question of overt advocacy in the name of the licensee, with the broader issue of insuring that the station's broadcasts devoted to the consideration of public issues will provide the listening public with a fair and balanced presentation of differing viewpoints on such issues. . . . If it be true that station good will and licensee prestige, where it exists, may give added weight to opinion expressed by the licensee, it does not follow that such opinion should be excluded from the air. . . . *Assurance of fairness must in the final analysis be achieved, not by the exclusion of particular views because of the source of the views . . . but by making the microphone available, for the presentation of contrary views . . . ." Id.,* at 1253–1254 (emphasis added).

a variety of other regulatory means that intrude far less drastically upon the "journalistic freedom" of noncommercial broadcasters. *Columbia Broadcasting System, Inc.* v. *Democratic National Committee*, 412 U. S., at 110. The requirements of the FCC's fairness doctrine, for instance, which apply to commercial and noncommercial stations alike, ensure that such editorializing would maintain a reasonably balanced and fair presentation of controversial issues. Thus, even if the management of a noncommercial educational station were inclined to seek to further only its own partisan views when editorializing, it simply could not do so. Indeed, in considering the constitutionality of the FCC's fairness doctrine, the Court in *Red Lion* considered precisely the same justification invoked by the Government today in support of § 399: that without some requirement of fairness and balance, "station owners . . . would have unfettered power . . . to communicate only their own views on public issues . . . and to permit on the air only those with whom they agreed." 395 U. S., at 392. The solution to this problem offered by § 399, however, is precisely the opposite of the remedy prescribed by the FCC and endorsed by the Court in *Red Lion*. Rather than requiring noncommercial broadcasters who express editorial opinions on controversial subjects to permit *more speech* on such subjects to ensure that the public's First Amendment interest in receiving a balanced account of the issue is met, § 399 simply silences all editorial speech by such broadcasters. Since the breadth of § 399 extends so far beyond what is necessary to accomplish the goals identified by the Government, it fails to satisfy the First Amendment standards that we have applied in this area.

We therefore hold that even if some of the hazards at which § 399 was aimed are sufficiently substantial, the restriction is not crafted with sufficient precision to remedy those dangers that may exist to justify the significant abridgment of speech worked by the provision's broad ban on editorializing. The

statute is not narrowly tailored to address any of the Government's suggested goals. Moreover, the public's "paramount right" to be fully and broadly informed on matters of public importance through the medium of noncommercial educational broadcasting is not well served by the restriction, for its effect is plainly to diminish rather than augment "the volume and quality of coverage" of controversial issues. *Red Lion*, 395 U. S., at 393. Nor do we see any reason to deny noncommercial broadcasters the right to address matters of public concern on the basis of merely speculative fears of adverse public or governmental reactions to such speech.

## IV

Although the Government did not present the argument in any form to the District Court,[26] it now seeks belatedly to justify § 399 on the basis of Congress' spending power. Relying upon our recent decision in *Regan* v. *Taxation With Representation of Washington*, 461 U. S. 540 (1983), the Government argues that by prohibiting noncommercial educational stations that receive CPB grants from editorializing, Congress has, in the proper exercise of its spending power, simply determined that it "will not subsidize public broadcasting station editorials." Brief for Appellant 42. In *Taxation With Representation*, the Court found that Congress could, in the exercise of its spending power, reasonably refuse to subsidize the lobbying activities of tax-exempt charitable organizations by prohibiting such organizations from using tax-deductible contributions to support their lobbying efforts. In so holding, however, we explained that such organizations remained free "to receive [tax-]deductible

---

[26] See Defendant's Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Summary Judgment (July 22, 1981); Defendant's Supplemental Memorandum on Amendment of Section 399 (Sept. 15, 1981); Defendant's Memorandum in Support of Its Motion to Dismiss the Second Amended Complaint (Oct. 13, 1981).

contributions to support nonlobbying activit[ies]." 461 U. S., at 545. Thus, a charitable organization could create, under § 501(c)(3) of the Internal Revenue Code, 26 U. S. C. § 501(c)(3), an affiliate to conduct its nonlobbying activities using tax-deductible contributions, and, at the same time, establish, under § 501(c)(4), a separate affiliate to pursue its lobbying efforts without such contributions. 461 U. S., at 544; see also *id.*, at 552–553 (BLACKMUN, J., concurring). Given that statutory alternative, the Court concluded that "Congress has not infringed any First Amendment rights or regulated any First Amendment activity; [it] has simply chosen not to pay for TWR's lobbying." *Id.*, at 546.

In this case, however, unlike the situation faced by the charitable organization in *Taxation With Representation*, a noncommercial educational station that receives only 1% of its overall income from CPB grants is barred absolutely from all editorializing. Therefore, in contrast to the appellee in *Taxation With Representation*, such a station is not able to segregate its activities according to the source of its funding. The station has no way of limiting the use of its federal funds to all noneditorializing activities, and, more importantly, it is barred from using even wholly private funds to finance its editorial activity.

Of course, if Congress were to adopt a revised version of § 399 that permitted noncommercial educational broadcasting stations to establish "affiliate" organizations which could then use the station's facilities to editorialize with nonfederal funds, such a statutory mechanism would plainly be valid under the reasoning of *Taxation With Representation*. Under such a statute, public broadcasting stations would be free, in the same way that the charitable organization in *Taxation With Representation* was free, to make known its views on matters of public importance through its nonfederally funded, editorializing affiliate without losing federal grants for its noneditorializing broadcast activities. Cf. *id.*,

at 544.   But in the absence of such authority, we must reject the Government's contention that our decision in *Taxation With Representation* is controlling here.[27]

---

[27] JUSTICE REHNQUIST's effort to prop up his position by relying on our decisions upholding certain provisions of the Hatch Act, 5 U. S. C. § 7324 *et seq.*, only reveals his misunderstanding of what is at issue in *this* case. For example, in both *United Public Workers* v. *Mitchell*, 330 U. S. 75 (1947), and *CSC* v. *Letter Carriers*, 413 U. S. 548 (1973), the Court has upheld § 9(a) of the Hatch Act—a provision that differs from § 399 in three fundamental respects: first, the statute only prohibits Government employees from "active participation in political management and political campaigns," and, accordingly, "[e]xpressions, public or private, on public affairs, personalities and matters of public interest" are not proscribed, *id.*, at 556; second, the constitutionality of that restriction is grounded in the Government's substantial and important interest in ensuring effective job performance by its own employees, *id.*, at 564–565; and, finally, these restrictions evolved over a century of governmental experience with less restrictive alternatives that proved to be inadequate to maintain the effective operation of government, *id.*, at 557–563.   Here, by contrast, the editorializing ban in § 399 directly suppresses not only political endorsements but all editorial expression on matters of public importance; it applies to independent, nongovernmental entities rather than to the Government's own employees; and, it is not grounded in any prior governmental experience with less restrictive means.

More importantly, in neither of those cases did the Court even consider that the restrictions could be justified simply because these employees were receiving Government funds, nor did it find that a lesser degree of judicial scrutiny was required simply because Government funds were involved.

JUSTICE REHNQUIST's reliance upon *Oklahoma* v. *CSC*, 330 U. S. 127 (1947), see *post*, at 405–406, is also misplaced.   There, a principal issue addressed by the Court was Oklahoma's claim that § 12 of the Hatch Act invaded the State's sovereignty in violation of the Tenth Amendment, because it authorized the Civil Service Commission to withhold federal funds from States whose officers violated the Act.   As the Court noted, "[t]he coercive effect of the authorization to withhold sums allocated to a state is relied upon as an interference with the reserved powers of the state."   *Id.*, at 142.   After citing *Mitchell*, *supra*, for the proposition that the Act did not impermissibly interfere with an employee's freedom of expression in political matters, 330 U. S., at 142, the Court explained: "While the United

## V

In conclusion, we emphasize that our disposition of this case rests upon a narrow proposition. We do not hold that the Congress or the FCC is without power to regulate the content, timing, or character of speech by noncommercial educational broadcasting stations. Rather, we hold only that the specific interests sought to be advanced by §399's ban on editorializing are either not sufficiently substantial or are not served in a sufficiently limited manner to justify the substantial abridgment of important journalistic freedoms which the First Amendment jealously protects. Accordingly, the judgment of the District Court is

*Affirmed.*

JUSTICE WHITE: Believing that the editorializing and candidate endorsement proscription stand or fall together and being confident that Congress may condition use of its funds on abstaining from political endorsements, I join JUSTICE REHNQUIST's dissenting opinion.

JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE and JUSTICE WHITE join, dissenting.

All but three paragraphs of the Court's lengthy opinion in this case are devoted to the development of a scenario in which the Government appears as the "Big Bad Wolf," and appellee Pacifica as "Little Red Riding Hood." In the Court's scenario the Big Bad Wolf cruelly forbids Little Red

---

States is not concerned with, and has no power to regulate, local political activities as such of state officials, it does have power to fix the terms upon which its money allotments to states shall be disbursed. *The Tenth Amendment does not forbid the exercise of this power in the way that Congress has proceeded in this case.*" *Id.*, at 143 (emphasis added). Thus, it was only in the context of rejecting Oklahoma's Tenth Amendment claim that the Court used the language cited by the dissent. Just as in *Mitchell*, and *Letter Carriers*, therefore, the Court never intimated in *Oklahoma v. CSC* that the mere presence of Government funds was a sufficient reason to uphold the Hatch Act's restrictions on employee freedoms on the basis of relaxed First Amendment standards.

Riding Hood to take to her grandmother some of the food that she is carrying in her basket. Only three paragraphs are used to delineate a truer picture of the litigants, wherein it appears that some of the food in the basket was given to Little Red Riding Hood by the Big Bad Wolf himself, and that the Big Bad Wolf had told Little Red Riding Hood in advance that if she accepted his food she would have to abide by his conditions. Congress in enacting § 399 of the Public Broadcasting Act, 47 U. S. C. § 399, has simply determined that public funds shall not be used to subsidize noncommercial, educational broadcasting stations which engage in "editorializing" or which support or oppose any political candidate. I do not believe that anything in the First Amendment to the United States Constitution prevents Congress from choosing to spend public moneys in that manner. Perhaps a more appropriate analogy than that of Little Red Riding Hood and the Big Bad Wolf is that of Faust and Mephistopheles; Pacifica, well aware of § 399's condition on its receipt of public money, nonetheless accepted the public money and now seeks to avoid the conditions which Congress legitimately has attached to receipt of that funding.

While noncommercial, educational broadcasting has a long history in this country, its success was spotty at best until the Federal Government came to its assistance some 45 years ago. Beginning in the late 1930's, the Federal Communications Commission (FCC) reserved certain frequencies, first for educational radio, 47 CFR §§ 4.131–4.133 (1939), and then for educational television, *Television Assignments*, 41 F. C. C. 148 (1952). But even with that assistance, by 1962 there were only 50 educational television stations on the air, and two-thirds of the population had no access to educational television. S. Rep. No. 67, 87th Cong., 1st Sess., 3 (1961). In that year Congress passed the Educational Television Act of 1962, Pub. L. 87–447, 76 Stat. 64, which appropriated $32 million over a period of five years to aid the construction of educational stations, and by 1967, 126 such stations were operating.

Congress' vision was that public broadcasting would be a forum for the educational, cultural, and public affairs broadcasting which commercial stations had been unable or unwilling to furnish. In order to further that vision, in 1967 Congress passed the Public Broadcasting Act of 1967, Pub. L. 90–129, 81 Stat. 365, 47 U. S. C. § 390 *et seq.*, of which § 399 is a part, which created the Corporation for Public Broadcasting (CPB), a nonprofit, Government-chartered corporation governed by a Board of Directors appointed by the President. Although Congress could have chosen to create a federally owned broadcasting network, instead it chose a Government funding program whereby CPB would make grants to stations owned by others, fund the production of programs, and assist in the establishment and development of interconnection systems.

Congress' intent was that CPB's subsidies would ensure that "programs of high quality, diversity, creativity, excellence, and innovation, which are obtained from diverse sources, will be made available to public telecommunications entities, with strict adherence to objectivity and balance in all programs or series of programs of a controversial nature." 47 U. S. C. § 396(g)(1)(A). Understandably Congress did not leave its creature CPB free to roam at large in the broadcasting world, but instead imposed certain restrictions, in keeping with Congress' purposes in passing the Act, on CPB's authorization to grant funds. For example, Congress required that stations receiving CPB grants be government entities or nonprofit organizations, 47 U. S. C. §§ 397(6), (7), and it prohibited them from selling air time for any purpose whatever—including selling time for political or public affairs presentations. §§ 397(7), 399a; see 47 CFR §§ 73.503(d), 73.621(e) (1983). Furthermore, in order to prevent recipient stations from serving as outlets for the political and ideological views of station owners and managers, Congress also insisted in § 399 that subsidized educational stations not engage in editorializing or endorsing or opposing political candidates.

The Court's three-paragraph discussion of why § 399, repeatedly reexamined and retained by Congress, violates the First Amendment is to me utterly unpersuasive. Congress has rationally determined that the bulk of the taxpayers whose moneys provide the funds for grants by the CPB would prefer not to see the management of local educational stations promulgate its own private views on the air at taxpayer expense. Accordingly Congress simply has decided not to subsidize stations which engage in that activity.

Last Term, in *Regan* v. *Taxation With Representation of Washington*, 461 U. S. 540 (1983), we upheld a provision of the Internal Revenue Code which deprives an otherwise eligible organization of its tax-exempt status and its right to receive tax-deductible contributions if it engages in lobbying. We squarely rejected the contention that Congress' decision not to subsidize lobbying violates the First Amendment, even though we recognized that the right to lobby is constitutionally protected. In so holding we reiterated that "a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right." *Id.*, at 549. We also rejected the notion that, because Congress chooses to subsidize some speech but not other speech, its exercise of its spending powers is subject to strict judicial scrutiny. *Id.*, at 547–548.

Relying primarily on the reasoning of the concurrence rather than of the majority opinion in *Taxation with Representation*, the Court today seeks to avoid the thrust of that opinion by pointing out that a public broadcasting station is barred from editorializing with its nonfederal funds even though it may receive only a minor fraction of its income from CPB grants. The Court reasons that § 399 does not operate simply to restrict the use of federal funds to purposes defined by Congress; instead, it goes further by prohibiting any station that receives "only 1% of its overall income from CPB grants" from using "even wholly private funds to finance its editorial activity." *Ante*, at 400.

But to me there is no distinction between § 399 and the statute which we upheld in *Oklahoma* v. *CSC*, 330 U. S. 127 (1947). Section 12(a) of the Hatch Act totally prohibits any local or state employee who is employed in any activity which receives partial or total financing from the United States from taking part in any political activities. One might just as readily denounce such congressional action as prohibiting employees of a state or local government receiving even a minor fraction of that government's income from federal assistance from exercising their First Amendment right to speak. But not surprisingly this Court upheld the Hatch Act provision in *Oklahoma* v. *CSC*, *supra*, succinctly stating:

> "While the United States is not concerned with, and has no power to regulate, local political activities as such of state officials, it does have power to fix the terms upon which its money allotments to states shall be disbursed." *Id.*, at 143.*

See also *CSC* v. *Letter Carriers*, 413 U. S. 548 (1973); *United Public Workers* v. *Mitchell*, 330 U. S. 75 (1947) (rejecting a First Amendment attack on the Hatch Act provisions applicable to federal employees).

The Court seems to believe that Congress actually subsidizes editorializing only if a station uses federal money specifically to cover the expenses that the Court believes can be isolated as editorializing expenses. But to me the Court's approach ignores economic reality. CPB's unrestricted grants are used for salaries, training, equipment, promotion, etc.—financial expenditures which benefit all aspects of a station's programming, including management's editorials.

---

*The Court takes pains to show that the argument rejected in *Oklahoma* v. *CSC* was a Tenth Amendment argument. *Ante*, at 401–402, n. 27. Without belaboring the point, in my view a fair reading of the opinion is that the Court used the quoted language in that case to refer to a First Amendment argument similar to this one, as well as to a Tenth Amendment argument.

Given the impossibility of compartmentalizing programming expenses in any meaningful way, it seems clear to me that the only effective means for preventing the use of public moneys to subsidize the airing of management's views is for Congress to ban a subsidized station from all on-the-air editorializing. Under the Court's view, if Congress decided to withhold a 100% subsidy from a station which editorializes, that decision would be constitutional under the principle affirmed in our *Taxation With Representation* decision. Surely on these facts, the distinction between the Government's power to withhold a 100% subsidy, on the one hand, and the 20–30% subsidy involved here, 547 F. Supp. 379, 385 (CD Cal. 1982), on the other hand, is simply trivialization.

This is not to say that the Government may attach *any* condition to its largess; it is only to say that when the Government is simply exercising its power to allocate its own public funds, we need only find that the condition imposed has a rational relationship to Congress' purpose in providing the subsidy and that it is not primarily " " "aimed at the suppression of dangerous ideas." " " *Cammarano* v. *United States*, 358 U. S. 498, 513 (1959), quoting *Speiser* v. *Randall*, 357 U. S. 513, 519 (1958), in turn quoting *American Communications Assn.* v. *Douds*, 339 U. S. 382, 402 (1950). In this case Congress' prohibition is directly related to its purpose in providing subsidies for public broadcasting, and it is plainly rational for Congress to have determined that taxpayer moneys should not be used to subsidize management's views or to pay for management's exercise of partisan politics. Indeed, it is entirely rational for Congress to have wished to avoid the appearance of Government sponsorship of a particular view or a particular political candidate. Furthermore, Congress' prohibition is strictly neutral. In no sense can it be said that Congress has prohibited only editorial views of one particular ideological bent. Nor has it prevented public stations from airing programs, documentaries, interviews, etc. dealing with controversial subjects, so long as manage-

ment itself does not expressly endorse a particular viewpoint. And Congress has not prevented station management from communicating its own views on those subjects through any medium other than subsidized public broadcasting.

For the foregoing reasons I find this case entirely different from the so-called "unconstitutional condition" cases, wherein the Court has stated that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially his interest in freedom of speech." *Perry* v. *Sindermann*, 408 U. S. 593, 597 (1972). In those cases the suppressed speech was not content-neutral in the same sense as here, and in those cases, there is at best only a strained argument that the legislative purpose of the condition imposed was to avoid *subsidizing* the prohibited speech. *Speiser* v. *Randall, supra,* is illustrative of the difference. In that case California's decision to deny its property tax exemption to veterans who would not declare that they would not work to overthrow the government was plainly directed at suppressing what California regarded as speech of a dangerous content. And the condition imposed was so unrelated to the benefit to be conferred that it is difficult to argue that California's property tax exemption actually subsidized the dangerous speech.

Here, in my view, Congress has rationally concluded that the bulk of taxpayers whose moneys provide the funds for grants by the CPB would prefer not to see the management of public stations engage in editorializing or the endorsing or opposing of political candidates. Because Congress' decision to enact § 399 is a rational exercise of its spending powers and strictly neutral, I would hold that nothing in the First Amendment makes it unconstitutional. Accordingly, I would reverse the judgment of the District Court.

JUSTICE STEVENS, dissenting.

The court jester who mocks the King must choose his words with great care. An artist is likely to paint a flattering portrait of his patron. The child who wants a new toy

does not preface his request with a comment on how fat his mother is. Newspaper publishers have been known to listen to their advertising managers. Elected officials may remember how their elections were financed. By enacting the statutory provision that the Court invalidates today, a sophisticated group of legislators expressed a concern about the potential impact of Government funds on pervasive and powerful organs of mass communication. One need not have heard the raucous voice of Adolf Hitler over Radio Berlin to appreciate the importance of that concern.

As JUSTICE WHITE correctly notes, the statutory prohibitions against editorializing and candidate endorsements rest on the same foundation. In my opinion that foundation is far stronger than merely "a rational basis" and it is not weakened by the fact that it is buttressed by other provisions that are also designed to avoid the insidious evils of government propaganda favoring particular points of view. The quality of the interest in maintaining government neutrality in the free market of ideas—of avoiding subtle forms of censorship and propaganda—outweigh the impact on expression that results from this statute. Indeed, by simply terminating or reducing funding, Congress could curtail much more expression with no risk whatever of a constitutional transgression.

In order to explain my assessment of the case, it is necessary first to supplement the majority's description of the impact of the statute on free expression and then to comment on the justification for that impact.

I

The relevant facts may be briefly stated. Appellee League of Women Voters of California, a nonprofit organization, wants to enlist the "editorial support" of educational broadcasters in support of its causes. App. 8. Appellee Henry Waxman, a regular listener and viewer of educational stations, desires to hear the "editorial opinions" of educa-

tional stations. *Id.*, at 9. Appellee Pacifica, a nonprofit educational corporation which operates five educational radio stations—the broadcasts from which reach 20 percent of the Nation's population—wants to "broadcast its views on various important public issues, and . . . clearly label those views as being editorials broadcast on behalf of the Pacifica management." *Id.*, at 9–10.

In short, Pacifica wants to broadcast its views to Waxman via its radio stations; Waxman wants to listen to those views on his radio; and the League of Women Voters wants a chance to convince Pacifica to take positions its members favor in its radio broadcasts.

All of these wants could be realized but for the fact that Pacifica receives public funds to finance its broadcasts. Because the Government subsidizes its broadcasts, a federal statute prohibits Pacifica from broadcasting its views—labeled as such—via the radio stations it operates. That statute now provides:

> "No noncommercial educational broadcasting station which receives a grant from the Corporation under subpart C of this part may engage in editorializing. No noncommercial educational broadcasting station may support or oppose any candidate for public office." 47 U. S. C. § 399.[1]

Although appellees originally challenged the validity of the entire statute, in their amended complaint they limited their attack to the prohibition against editorializing.[2] In its anal-

---

[1] As originally enacted in 1967, the statute provided:

"No noncommercial educational broadcasting station may engage in editorializing or may support or oppose any candidate for political office." Pub. L. 90–129, Title II, § 201(8), 81 Stat. 368.

[2] Appellees' abandonment of their attack on the ban on political endorsements merits some comment. At one level it is perplexing, given that we have stated that such political expression is at the very core of the First Amendment's protection, see, *e. g., Brown* v. *Hartlage,* 456 U. S. 45 (1982); *Monitor Patriot Co.* v. *Roy,* 401 U. S. 265, 272 (1971), and given

ysis of the case, the Court assumes that the ban on political endorsements is severable from the first section and that it may be constitutional.[3]    In view of the fact that the major

---

that Pacifica cannot escape the ban on political endorsements simply by declining to accept Government funds.    Viewed solely from the perspective of the First Amendment interests at stake, therefore, it would appear that the ban on candidate endorsements is more suspect than the ban on editorializing.

In *New York Times Co*. v. *Sullivan*, 376 U. S. 254 (1964), we expressly recognized the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials. . . ."    *Id*., at 270.    Appellee Pacifica, which originally asserted a desire to endorse political candidates, apparently has now decided that it does not want to engage in a "wide-open" debate on public issues—it no longer asserts the right to make "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials" over its radio stations which are, in fact, funded by Government officials.

In any event, if these particular litigants abandoned their attack on the seemingly more suspect political endorsement ban for tactical reasons, that fact is an indication of the strength of the same basic governmental interest which forms the foundation of the provision which they continue to challenge.

[3] The Court actually raises the wrong severability issue.    The serious question in this regard is whether the entire public funding scheme is severable from the prohibition on editorializing and political endorsements. The legislative history of the statute indicates the strength of the congressional aversion to these practices.    The basic notion of providing Government subsidies to these domestic organs for the dissemination of information—"educational" stations—was viewed as extremely troubling.    The line between education and indoctrination is a subtle one, and it is one Congress did not want these publicly funded stations to cross.    The fact that the House Committee Report stated in passing that the provision was added out of "an abundance of caution," merely shows that Congress deemed an abundance of caution necessary.    The majority may view the congressional concerns—potential governmental censorship, giving louder voices to a privileged few station owners, and the use of taxpayer funds to subsidize expression of viewpoints with which the taxpayers may not agree—as insufficiently weighty to justify the statute, but Congress clearly thought they were weighty enough.

412

difference between the ban on political endorsements is based on the content of the speech, it is apparent that the entire rationale of the Court's opinion rests on the premise that it may be permissible to predicate a statutory restriction on candidate endorsements on the difference between the content of that kind of speech and the content of other expressions of editorial opinion.

The Court does not tell us whether speech that endorses political candidates is more or less worthy of protection than other forms of editorializing, but it does iterate and reiterate the point that "the expression of editorial opinion" is a special kind of communication that "is entitled to the most exacting degree of First Amendment protection." *Ante*, at 375–376; see also *ante*, at 380 n. 13, 381, 382, 383, and 384.[4]

Neither the fact that the statute regulates only one kind of speech, nor the fact that editorial opinion has traditionally been an important kind of speech, is sufficient to identify the character or the significance of the statute's impact on speech. Three additional points are relevant. First, the statute does not prohibit Pacifica from expressing its opinion through any avenue except the radio stations for which it receives federal financial support. It eliminates the subsidized channel of communication as a forum for Pacifica itself, and thereby deprives Pacifica of an advantage it would otherwise have over other speakers, but it does not exclude Pacifica from the marketplace for ideas. Second, the statute does not curtail the expression of opinion by individual commen-

---

[4] Thus, once again the Court embraces the obvious proposition that some speech is more worthy of protection than other speech—that the right to express editorial opinion may be worth fighting to preserve even though the right to hear less worthy speech may not—a proposition that several Members of today's majority could only interpret "as an aberration" in *Young* v. *American Mini Theatres, Inc.*, 427 U. S. 50, 87 (1976) (dissenting opinion) ("The fact that the 'offensive' speech here may not address 'important' topics—'ideas of social and political significance,' in the Court's terminology, [427 U. S., at 61]—does not mean that it is less worthy of constitutional protection").

tators who participate in Pacifica's programs. The only comment that is prohibited is a statement that Pacifica agrees or disagrees with the opinions that others may express on its programs. Third, and of greatest significance for me, the statutory restriction is completely neutral in its operation—it prohibits all editorials without any distinction being drawn concerning the subject matter or the point of view that might be expressed.[5]

---

[5] Section 399's ban on editorializing is a content-based restriction on speech, but not in the sense that the majority implies. The majority speaks of "editorial opinion" as if it were some sort of special species of opinion, limited to issues of public importance. See, e. g., ante, at 375–376. The majority confuses the typical content of editorials with the meaning of editorial itself. An editorial is, of course, a statement of the *management's* opinion on any topic imaginable. The Court asserts that what the statute "forecloses is the expression of editorial opinion on 'controversial issues of public importance.'" *Ante*, at 381. The statute is not so limited. The content which is prohibited is that the station is not permitted to state its opinion with respect to any matter. In short, it may not be an on-the-air advocate if it accepts Government funds for its broadcasts. The prohibition on editorializing is not directed at any particular message a station might wish to convey, cf. *Linmark Associates, Inc.* v. *Willingboro*, 431 U. S. 85, 96–97 (1977); see generally *Whitney* v. *California*, 274 U. S. 357, 377 (1927) (Brandeis, J., concurring). Unlike the Court, I am not troubled by the fact that the stations are allowed to make "daily announcements of the station's program schedule or over-the-air appeals for contributions from listeners," *ante*, at 383, for it is quite plain that this statute is not directed at curtailing expression of particular points of view on controversial issues; it is designed to assure to the extent possible that the station does not become a vehicle for Government propaganda.

Paradoxically, § 399 is later attacked by the majority as essentially being underinclusive because it does not prohibit "controversial" national programming that is often aired with substantial federal funding. Here the Court recognizes that the ban imposed by § 399 "is plainly not directed at the potentially controversial content of such programs," *ante*, at 391, which only demonstrates that it is not directed at the substance of communication at all. Next, § 399's ban on editorializing is attacked by the majority on overinclusive grounds—because it is content-neutral—since it prohibits a "potentially infinite variety of speech, most of which would not be related in any way to governmental affairs, political candidacies, or elections." *Ante*, at 393. Hence, while earlier the majority attacked § 399 as being

## II

The statute does not violate the fundamental principle that the citizen's right to speak may not be conditioned upon the sovereign's agreement with what the speaker intends to say.[6] On the contrary, the statute was enacted in order to protect that very principle—to avoid the risk that some speakers will be rewarded or penalized for saying things that appeal to—or are offensive to—the sovereign.[7] The interests the statute

content-based, it is now attacked as being noncontent-based, applying to expressions of opinion—such as "urging improvements in a town's parks or museums," *ibid.*—which does not pose, in the Court's view at least, a realistic danger of governmental interference because of its content.

[6] "The general principle that has emerged from this line of cases is that the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others. See *Bolger* v. *Youngs Drug Products Corp.*, 463 U. S. 60, 65, 72 (1983); *Consolidated Edison Co.* v. *Public Service Comm'n of N. Y.*, 447 U. S. 530, 535–536 (1980); *Carey* v. *Brown*, 447 U. S. 455, 462–463 (1980); *Young* v. *American Mini Theatres, Inc.*, 427 U. S. 50, 63–65, 67–68 (1976) (plurality opinion); *Police Department of Chicago* v. *Mosley*, 408 U. S. 92, 95–96 (1972)." *City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789, 804 (1984).

[7] It is ironic indeed that the majority states that it must be particularly wary in assessing § 399 "to determine whether it reflects an impermissible attempt 'to allow a government [to] control . . . the search for political truth'", *ante*, at 384 (citation omitted), given that the very object of § 399 is to prevent the Government from controlling the search for political truth. Indeed, the Court recognizes that when Congress decided to provide financial support to educational stations, "all concerned agreed that this step posed some risk that these traditionally independent stations might be pressured into becoming forums devoted solely to programming and views that were acceptable to the Federal Government." *Ante*, at 386.

Moreover, the statute will also protect the listener's interest in not having his tax payments used to finance the advocacy of causes he opposes. The majority gives extremely short shrift to the Government's interest in minimizing the use of taxpayer moneys to promote private views with which the taxpayers may disagree. The Court briefly observes that the taxpayers do not have a constitutionally protected right to enjoin such expenditures and then leaps to the conclusion that given the fact the funding scheme itself is not unconstitutional, this interest cannot be used to

is designed to protect are interests that underlie the First Amendment itself.

In my judgment the interest in keeping the Federal Government out of the propaganda arena is of overriding importance. That interest is of special importance in the field of electronic communication, not only because that medium is so powerful and persuasive, but also because it is the one form of communication that is licensed by the Federal Government.[8] When the Government already has great potential

---

support the statute at issue here. *Ante*, at 385, n. 16. The conclusion manifestly does not follow from the premise, and this interest is plainly legitimate and significant.

[8] We have consistently adhered to the following guiding principles applicable to First Amendment claims in the area of broadcasting, and they bear repeating at some length:

"Where there are substantially more individuals who want to broadcast than there are frequencies to allocate, it is idle to posit an unabridgeable First Amendment right to broadcast comparable to the right of every individual to speak, write, or publish. . . .

". . . No one has a First Amendment right to a license or to monopolize a radio frequency . . . .

"By the same token, as far as the First Amendment is concerned those who are licensed stand no better than those to whom licenses are refused. A license permits broadcasting, but the licensee has no constitutional right to be the one who holds the license or to monopolize a radio frequency to the exclusion of his fellow citizens. There is nothing in the First Amendment which prevents the Government from requiring a licensee to share his frequency with others and to conduct himself as a proxy or fiduciary with obligations to present those views and voices which are representative of his community and which would otherwise, by necessity, be barred from the airwaves.

"[T]he people as a whole retain their interest in free speech by radio and their collective right to have the medium function consistently with the ends and purposes of the First Amendment. It is the right of the viewers and listeners, not the right of the broadcasters, which is paramount. . . . It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, rather than to countenance monopolization of that market, whether it be by the Government itself or a private licensee. . . . It is the right of the public to receive . . . ideas . . . which is crucial here." *Red Lion Broadcasting Co. v. FCC*, 395 U. S. 367, 388–390 (1969).

power over the electronic media, it is surely legitimate to enact statutory safeguards to make sure that it does not cross the threshold that separates neutral regulation from the subsidy of partisan opinion.

The Court does not question the validity of the basic interests served by § 399. See *ante*, at 386. Instead, it suggests that the statute does not substantially serve those interests because the Public Broadcasting Act operates in many other respects to insulate local stations from governmental interference. See *ante*, at 388–390. In my view, that is an indication of nothing more than the strength of the governmental interest involved here—Congress enacted many safeguards because the evil to be avoided was so grave. Organs of official propaganda are antithetical to this Nation's heritage, and Congress understandably acted with great caution in this area.[9] It is no answer to say that the other statutory provisions "substantially reduce the risk of governmental interference with the editorial judgments of local stations without restricting those stations' ability to speak on matters of public concern." *Ante*, at 390. The other safeguards protect the stations from interference with judgments that they will necessarily make in selecting programming, but those judgments are relatively amorphous. No safeguard is foolproof; and the fact that funds are dispensed according to largely "objective" criteria certainly is no guarantee. Individuals must always make judgments in allocating funds, and pressure can be exerted in subtle ways as well as through outright fund-cutoffs.

Members of Congress, not members of the Judiciary, live in the world of politics. When they conclude that there is a real danger of political considerations influencing the dispensing of this money and that this provision is necessary to insulate grantees from political pressures in addition to the other safeguards, that judgment is entitled to our respect.

---

[9] Cf. 22 U. S. C. § 1461 (prohibiting the International Communication Agency—successor to the United States Information Agency—from disseminating information in the United States).

The magnitude of the present danger that the statute is designed to avoid is admittedly a matter about which reasonable judges may disagree.[10]  Moreover, I would agree that the risk would be greater if other statutory safeguards were removed.  It remains true, however, that Congress has the power to prevent the use of public funds to subsidize the expression of partisan points of view, or to suppress the propagation of dissenting opinions.  No matter how great or how small the immediate risk may be, there surely is more than a theoretical possibility that future grantees might be influenced by the ever present tie of the political purse strings, even if those strings are never actually pulled.  "[O]ne who knows that he may dissent knows also that he somehow consents when he does not dissent."  H. Arendt, Crises of the Republic 88 (1972), citing 1 A. de Tocqueville, Democracy in America 419 (1945).[11]

---

[10] The majority argues that the Government's concededly substantial interest in ensuring that audiences of educational stations will not perceive the station to be a Government propaganda organ can be fully satisfied by requiring such stations to broadcast a disclaimer each time they editorialize stating that the editorial "does not in any way represent the views of the Federal Government . . . ."  *Ante,* at 395.  This solution would be laughable were it not so Orwellian: the answer to the fact that there is a real danger that the editorials are really Government propaganda is for the Government to require the station to tell the audience that it is not propaganda at all!

[11] The "fairness doctrine" is no answer to the concern that Government-funded organs of mass communication will, overall, take a pro-Government slant in editorializing and thereby create a distortion in the marketplace of ideas.  First, the "fairness doctrine" is itself enforced by the Government.  Second, that doctrine does not guarantee other speakers access to the microphone if they disagree with editorial opinion expressed by the station on public policy issues.  No other voice need be heard if the Government determines that the station's editorial "fairly" presented the substance of "the" opposing view.  Moreover, as appellees argue, editorials from an institution which the public may hold in high regard may carry added weight in the marketplace of ideas.  See Brief for Appellees 15.  That fact, however, magnifies the evil sought to be avoided, for the danger is that pro-Government views that are not actually shared by that institution will be parroted to curry favor with its benefactor.

## III

The Court describes the scope of § 399's ban as being "defined solely on the basis of the content of the suppressed speech," *ante,* at 383, and analogizes this case to the regulation of speech we condemned in *Consolidated Edison Co. v. Public Service Comm'n of N. Y.,* 447 U. S. 530 (1980). This description reveals how the Court manipulates labels without perceiving the critical differences behind the two cases.

In *Consolidated Edison* the class of speakers that was affected by New York's prohibition consisted of regulated public utilities that had been expressing their opinion on the issue of nuclear power by means of written statements inserted in their customers' monthly bills. Although the scope of the prohibition was phrased in general terms and applied to a selected group of speakers, it was obviously directed at spokesmen for a particular point of view. The justification for the restriction was phrased in terms of the potential offensiveness of the utilities' messages to their audiences. It was a classic case of a viewpoint-based prohibition.

In this case, however, although the regulation applies only to a defined class of noncommercial broadcast licensees, it is common ground that these licensees represent heterogenous points of view.[12] There is simply no sensible basis for considering this regulation a viewpoint restriction—or, to use the Court's favorite phrase, to condemn it as "content-based"— because it applies equally to station owners of all shades of opinion. Moreover, the justification for the prohibition is not based on the "offensiveness" of the messages in the sense that that term was used in *Consolidated Edison.* Here, it is true that taxpayers might find it offensive if their tax moneys were being used to subsidize the expression of edi-

---

[12] That does not necessarily mean, however, "that the editorial voices of these stations will prove to be as distinctive, varied, and idiosyncratic as the various communities they represent," *ante,* at 391, given the potential effects of Government funding, see *supra,* at 416–417, and n. 11.

torial opinion with which they disagree, but it is the fact of the subsidy—not just the expression of the opinion—that legitimates this justification. Furthermore, and of greater importance, the principal justification for this prohibition is the overriding interest in forestalling the creation of propaganda organs for the Government.

I respectfully dissent.