**TELECOMMUNICATIONS RESEARCH AND ACTION CENTER and Media Access Project, Petitioners,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and the United States of America, Respondents,**

National Association of Broadcasters, Public Broadcasting Service, American Newspaper Publishers Association, Intervenors.

No. 85–1160.

United States Court of Appeals, District of Columbia Circuit.

Dec. 16, 1986.

As Amended Dec. 16, 1986.

Andrew Jay Schwartzman, Henry Geller and Donna Lampert, Washington, D.C., were on petitioners' suggestion for rehearing en banc.

Before WALD, Chief Judge, ROBINSON, MIKVA, EDWARDS, RUTH BADER GINSBURG, BORK, STARR, SILBERMAN, BUCKLEY, WILLIAMS, DOUGLAS GINSBURG, Circuit Judges.

Chief Judge WALD and Circuit Judge DOUGLAS GINSBURG did not participate in this order.

Circuit Judges SPOTTSWOOD W. ROBINSON, III, MIKVA, HARRY T. EDWARDS, RUTH BADER GINSBURG and STARR would grant the suggestion for rehearing en banc.

A statement of Circuit Judge MIKVA, joined by Circuit Judge HARRY T. EDWARDS, is attached.

A statement of Circuit Judge STARR, joined by Circuit Judges SPOTTSWOOD W. ROBINSON, III, and RUTH BADER GINSBURG, is attached.

A statement of Circuit Judge BORK is also attached.

## ON PETITIONERS' SUGGESTION FOR REHEARING EN BANC

### ORDER

PER CURIAM.

Petitioners' suggestion for rehearing *en banc* has been transmitted to the full Court. The taking of a vote was requested. A majority of the judges of the Court in regular active service have not voted in favor of the suggestion. Accordingly, it is

ORDERED, by the Court *en banc,* that the suggestion is denied.

MIKVA, Circuit Judge, with whom Circuit Judge HARRY T. EDWARDS joins, dissenting from the denial of rehearing en banc:

In the panel decision, the majority held that the fairness doctrine is not a "binding statutory obligation" under the Communications Act of 1934, 47 U.S.C. § 315(a) (1982) (the Act), and therefore found that the Federal Communications Commission (the Commission) is not precluded from altering the fairness obligation in the case of teletext broadcasting. *Telecommunications Research and Action Center and Media Access Project v. FCC,* 801 F.2d 501, 517 (D.C.Cir.1986). This holding is flatly wrong. In amending the Act in 1959, Congress not only "recognized and preserved" "an administrative construction," *see id.* at 517, it explicitly approved of, ratified and codified the fairness doctrine. The majority's conclusion to the contrary flies in the face of the legislative history of section 315 and interpretations of that provision by the Supreme Court as well as this court. I therefore dissent from the decision of this court to deny rehearing *en banc.*

Section 315 warned broadcasters and the Commission that the new bill's equal time exemptions did not disturb the Commis-

sion's fairness doctrine requirements. The clear import of the amendment's language and legislative history was that the bill's drafters understood the Act to already require the fairness doctrine under the Act's public interest standard. Section 315 merely reaffirmed what was already the law.

The Report that accompanied the 1959 bill as it first emerged from Senate Hearings declared that the proposed changes to the Act would not affect "[Commission] policy or existing law which holds that a licensee's *statutory obligation* to serve the public interest is to include [the duty to present] a fair cross section of opinion." Hearings on Political Broadcasting before the Communications Subcommittee of the Senate Committee on Interstate and Foreign Commerce, 86th Cong., 1st Sess. at 13 (1959) (emphasis added). Senator Proxmire, not satisfied with having the declaration buried in the Report, amended the bill on the floor to refer specifically to the fairness doctrine:

> but nothing in this sentence shall be construed as changing the basic intent of Congress with respect to the provisions of this act, which recognizes that television and radio frequencies are in the public domain, that the license to operate in such frequencies requires operation in the public interest, and that in newscasts, news interviews, news documentaries, on-the-spot coverage of news events, and panel discussions, all sides of public controversies shall be given as equal an opportunity to be heard as is practically possible.

105 Cong.Rec. 14457 (1959).

There is no doubt that Senator Proxmire referred to a "binding statutory obligation," not to a requirement imposed by the Commission pursuant to its authority under the Act. His amendment deals with "interpretation of the Communications Act itself." *Id.* at 14462 (Sen. Hartke). It states "a requirement that broadcasters shall live and shall abide by the rule of fairness." *Id.* ("I understand the amendment to be a statement or codification of

the standards of fairness. I understand that the Commission is now obliged by existing law and policy to abide by the standard of fairness.") (Sen. Pastore, Chairman of the Subcommittee).

The bill as reported from the House-Senate Conference modified the Senate version slightly to read essentially as section 315 does today. According to the Conference Report, the change in the Proxmire amendment was merely cosmetic. *Id.* at 17777; *see also* 105 Cong. Rec. 17831 (1959) ("We have maintained very carefully the spirit of the Proxmire amendment.") (Sen. Scott, Senate conferee). Indeed, the legislative history again evinces a recognition that the fairness principle is embodied in the Act itself. The Conference Report interpreted the provision as "a restatement of the basic policy of the 'standard of fairness' which is imposed on broadcasters under [the Act]." Conf.Rep. No. 1069, 86th Cong., 1st Sess. at 5 (1959), U.S.Code Cong. & Admin.News 1959, pp. 2564, 2584. In the words of Congressman Harris, Chairman of the House Committee that reported the bill, Section 315 "reaffirmed the 'standard of fairness' established under the [Act]." *Id.* at 17778.

The drafters insisted on retaining the Proxmire amendment, "if with some slight modifications," "to be a continuing reminder and admonition to the [Commission] and to the broadcasters alike, that [Congress was] not abandoning the philosophy that gave birth to section 315, in giving people the right to have a full and complete disclosure of conflicting views on news of interest to the people of the country." *Id.* at 17830 (Sen. Pastore).

The Supreme Court has expressed a similar understanding of the 1959 amendment. In *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), the Court upheld the fairness doctrine against constitutional challenge. In discussing the statutory basis for the doctrine, the Court stated that the "language makes it very plain that Congress, in 1959, announced that the phrase 'public interest,' which had been in the Act since 1927 imposed a duty on broadcasters to discuss

both sides of controversial public issues. In other words, the amendment ... inhered in the public interest standard." 395 U.S. at 380, 89 S.Ct. at 1801. The Court went on to explain that Congress "ratified" the Commission's fairness doctrine construction of the public interest standard "with positive legislation." *Id.* at 381–82, 89 S.Ct. at 1802; *see also id.* at 383–84, 89 S.Ct. at 1803–04 (discussing the legislative history of the amendment).

Post-*Red Lion* cases reinforce the interpretation of the amendment as having codified and therefore as mandating the doctrine. In 1973, the Court observed that in the Act "Congress has imposed on all broadcast licensees" "an affirmative and independent statutory obligation to provide full and fair coverage of public issues." *CBS v. Democratic National Committee,* 412 U.S. 94, 129–30, 93 S.Ct. 2080, 2100, 36 L.Ed.2d 772 (1973); *see also id.* at 110 n. 8, 93 S.Ct. at 2090 n. 8 ("Congress amended § 315 of the Act to give statutory approval to the Fairness Doctrine."); *id.* at 113 n. 12, 93 S.Ct. at 2092 n. 12 (same). Most recently, the Court declared that it was "not prepared to reconsider [its] longstanding approach without some signal from Congress or the FCC that technological developments have advanced so far that some revision of the system of broadcast regulation may be required." *FCC v. League of Women Voters of California,* 468 U.S. 364, 104 S.Ct. 3106, 3117 n. 11, 82 L.Ed.2d 278, 289 n. 11 (1984).

This court has repeatedly considered the fairness doctrine as part of the statutory framework of the Act. As Judge Robinson explained for the court, "[the] language placed in Section 315(a) in 1959 ... codifies the fairness doctrine formulated by the Commission in 1949." *Kennedy for President Committee v. FCC,* 636 F.2d 432, 438 (D.C.Cir.1980) (citing *Red Lion,* 395 U.S. at 377–78, 89 S.Ct. at 1799–1800). The doctrine, which "originally evolved under the authority of general provisions of the [Act] calling for regulation in the 'public interest,' ... has since received explicit statutory recognition, in the 1959 amendment."

*Straus Communications, Inc. v. FCC*, 530 F.2d 1001, 1007 n. 11 (D.C.Cir.1976) (Wright, J., for a unanimous court); *see also Accuracy in Media, Inc. v. FCC*, 521 F.2d 288, 296 n. 34 (D.C.Cir.1975), *cert. denied*, 425 U.S. 934, 96 S.Ct. 1664, 48 L.Ed.2d 175 (1976); *Brandywine-Main Line Radio, Inc. v. FCC*, 473 F.2d 16 (D.C. Cir.1972), *cert. denied*, 412 U.S. 922, 93 S.Ct. 2731, 37 L.Ed.2d 149 (1973).

With the exception of a few recent expressions of doubt by individual Commissioners, the Commission's position has consistently been that with the 1959 amendment, Congress specifically ordained the fairness doctrine as a statutory requirement. *See, e.g.*, Applicability of the Fairness Doctrine in the Handling of Controversial Issues of Public Importance, Appendix B, "The History of the Fairness Doctrine," 29 Fed.Reg. 10425 (1964); Letter to Senator Proxmire, 40 FCC2d 1238 (1973). For example, in a letter to Congressman Harris, the Commission stated that "since 1959 the [Act] imposes the specific obligation of fairness upon a broadcast licensee.... In short, there is a specific statutory obligation ... to be fair in treating controversial issues." Honorable Oren Harris, 40 FCC 582, 583 (1963). Significantly, after thoroughly canvassing the Act and its history, the Commission recently declined to conclude that "it had the authority without further Congressional action to eliminate the fairness doctrine." Commission Brief at 31 n. 20 (citing FCC News Rept. No. DC–185 (Aug. 7, 1985)). In responding to the petition for review in this case, the Commission never argued that the fairness doctrine was *not* statutorily mandated. That argument is a construct of the majority of the panel who heard the case.

The primacy of Congress as policy-maker should not be blunted or eviscerated by courts which find either the policy or the policy-makers in error. When Congress ratifies an administrative determination it converts an agency decision into positive, affirmative law. While such a conversion ought not be lightly inferred, neither should it be arrogantly disregarded when

the history is as clear as it is here. In the 1959 amendment the Commission is not simply authorized to impose the fairness doctrine, it is compelled to do so. The doctrine has been encapsulated by Section 315 of the Act and the courts overreach to undo it.

STARR, Circuit Judge, with whom Circuit Judges SPOTTSWOOD W. ROBINSON, III, and RUTH BADER GINSBURG join, dissenting from the denial of rehearing en banc:

We agree that the issue discussed in Judge Mikva's dissenting statement is an important one meriting careful consideration by our court en banc. For that reason, and without prejudging the question, we would grant the suggestion for rehearing *en banc*.

BORK, Circuit Judge:

The panel opinion in this case held that the fairness doctrine evolved by the Federal Communications Commission is a Commission policy and is not embodied in statutory law. The dissent from the full court's denial of a petition for rehearing *en banc* contends that the doctrine has been enacted. Though I will not repeat the analysis of the panel opinion, I respond to the dissent in order to show that there are additional factors that compel the panel's result. That Congress merely ratified the Commission's position that the fairness doctrine is a valid exercise of delegated authority is shown by the clear import of the language of the 1959 amendment, the Supreme Court's reading of the statute and its legislative history, and the growth of the doctrine itself.

A.

The dissent's claim that Congress codified the Commission's fairness doctrine and made it a statutory obligation rests, most improbably, upon the language of a disclaimer within a proviso to the 1959 amendment to the Communications Act of 1934. Had Congress affirmatively intended to

make the fairness doctrine a statutory command, it surely would have employed a more direct and less offhanded approach than that.

In section 315(a) Congress provided that a broadcast licensee who allows a political candidate to use its station must give equal opportunities to all other candidates for the same office. This is followed by a proviso, the third sentence of which states that appearance by a candidate on various bona fide news programs shall not be considered a use of the station. The fourth sentence of the proviso is the disclaimer at issue here: "Nothing in the foregoing sentence [about news programs] shall be construed as relieving broadcasters, in connection with the presentation of [such news programs] from the obligation imposed upon them under this chapter to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance." 47 U.S.C. § 315(a) (1982).

The dissent claims that this disclaimer enacts the fairness doctrine as a statute the Commission is now powerless to change. But the language cannot be read that way. The disclaimer refers to an obligation imposed "under this chapter." No one claims that in 1959 Congress imposed such an obligation elsewhere in the chapter. The statute obviously refers to an obligation previously imposed. As will be shown, however, it is quite clear that Congress had not previously enacted the fairness doctrine. The only alternative is that the reference is to an obligation previously imposed by the Commission "under this chapter." The disclaimer then states that the preceding sentence is not to be construed as relieving broadcasters of the Commission's fairness doctrine.

It is plain, therefore, that in the 1959 amendment Congress was disclaiming any intent to dismantle the Commission's fairness policy. The previous sentence exempting appearances of candidates on news programs from the definition of "use" might have been so misconstrued. The most that Congress can be said to have ratified was the Commission's authority to frame a fairness doctrine under the "public interest" language of the Act.

### B.

Many of the remarks culled from the legislative history by the dissent are either ambiguous on the question before us or are read most easily as mere approvals of the Commission's exercise of its delegated authority. In any event, that same legislative history was canvassed by the Supreme Court in *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). Since the dissent makes much of that case, I will examine it in some detail to show that it is contrary to the dissent's position. I discuss first the passages upon which the dissent relies. After quoting the text of the disclaimer at issue here, the Court stated:

> This language makes it very plain that Congress, in 1959, announced that the phrase "public interest," which had been in the Act since 1927, imposed a duty on broadcasters to discuss both sides of controversial public issues. In other words, the amendment vindicated the FCC's general view that the fairness doctrine inhered in the public interest standard. Subsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction.

*Id.* at 380–81, 89 S.Ct. at 1801 (footnote omitted). This passage may, upon a casual reading, be taken in either of two ways. It may be taken as saying that the fairness doctrine was enacted by Congress in 1927. Or it may be read to say that the public interest concept enacted in 1927 gave the Commission the power to create the fairness doctrine. The one thing the passage most emphatically does not do is lend support to the dissent's theory that the fairness doctrine was enacted by the 1959 legislation. That idea appears nowhere except in the dissent.

Both before and after the passage cited, the *Red Lion* opinion repeatedly speaks in ways that show the 1959 disclaimer merely

approved the Commission's prior exercise of delegated discretion. Thus:

> The fairness doctrine finds specific recognition in statutory form, is in part modeled on explicit statutory provisions relating to political candidates, and is approvingly reflected in legislative history.

395 U.S. at 380, 89 S.Ct. at 1801. The first clause of that sentence refers to the 1959 amendment and claims only that it embodies "recognition" of the fairness doctrine. The second clause refers to the fact that the Commission modeled the doctrine on statutory provisions that did not enact the doctrine but provided parallels. The third clause claims no more than approval of the doctrine in legislative history. This is not the language of mandatory direction but of authorization.

The dissent relies upon the Court's statement that Congress "ratified" the fairness doctrine "with positive legislation." A quotation of the full passage shows, however, that the Court's statement unequivocally supports the panel opinion in this case, not the dissent. In finding it significant that Congress had refused to alter the Commission's construction, *Red Lion* stated:

> Here, the Congress has not just kept its silence by refusing to overturn the administrative construction, but has ratified it with positive legislation. Thirty years of consistent administrative construction left undisturbed by Congress until 1959, when that construction was expressly accepted, reinforce *the natural conclusion that the public interest language of the Act authorized the Commission to require licensees to use their stations for discussion of public issues, and that the FCC is free to implement this requirement by reasonable rules and regulations....*

395 U.S. at 381–82, 89 S.Ct. at 1802 (emphasis added; footnotes omitted). A Commission that is "authorized" and "free" to do things is not directed to do them.

Again, *Red Lion* states that Senator Proxmire's amendment "constituted a positive statement of doctrine and was altered to *the present merely approving language* in the conference committee." 395 U.S. at 383–84, 89 S.Ct. at 1803 (emphasis added; footnote omitted). The Court concluded that "the fairness doctrine and its component personal attack and political editorializing regulations are *a legitimate exercise of congressionally delegated authority,*" *id.* at 385, 89 S.Ct. at 1804 (emphasis added), and "[w]e cannot say that the FCC's declaratory ruling in *Red Lion,* or the regulations at issue in RTNDA, are beyond the scope of the congressionally conferred power to assure that stations are operated by those whose possession of a license serves 'the public interest.'" *Id.* at 386, 89 S.Ct. at 1804.

The dissent's reliance on two post-*Red Lion* cases is curious, for they cut against the dissent's argument. In *Columbia Broadcasting System v. Democratic National Committee,* 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973), the Court made a sharp distinction between Congress' treatment of air time for political candidates and its treatment of the fairness doctrine. The Court noted that the enactment of section 312(a) "essentially *codified* the Commission's prior interpretation of § 315(a) as requiring broadcasters to make time available to political candidates," 412 U.S. at 113–14 n. 12, 93 S.Ct. at 2092 n. 12 (emphasis added), but concluded only that the fairness doctrine had received "statutory approval." *Id.* In *FCC v. League of Women Voters of California,* 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984), the Court, in the passage cited by the dissent, was addressing the issue of whether the "scarcity" rationale should be reconsidered, *id.* at 376 n. 11, 104 S.Ct. at 3116 n. 11, and not whether the fairness doctrine had been codified. In the next footnote, however, the Court did directly address the question before us and rebutted the dissent's position here.

We note that the FCC, observing that "[i]f any substantial possibility exists that the [fairness doctrine] rules have impeded rather than furthered, First Amendment objectives, repeal may be

warranted on that ground alone," has tentatively concluded that the rules, by effectively chilling speech, do not serve the public interest, and has therefore proposed to repeal them. Notice of Proposed Rulemaking In re Repeal or Modification of the Personal Attack and Political Editorial Rules, 48 Fed.Reg. 28298, 28301 (1983). *Of course, the Commission may, in the exercise of its discretion, decide to modify or abandon these rules, and we express no view on the legality of either course.* *Id.* at 378 n. 12, 104 S.Ct. at 3117 n. 12 (emphasis added).

### C.

Quite aside from the legislative history discussed and summarized by the Supreme Court in *Red Lion,* there are other aspects of that history and of the growth of the fairness doctrine that preclude any notion that in 1927 Congress enacted the fairness doctrine. In the 1927 Act, Congress specifically adopted a provision requiring that "[i]f any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates." H.R.Rep. No. 1886, 69th Cong., 2d Sess. 10 (1927). Thus, Congress knew how to write language requiring "equal opportunities." It wrote nothing that embodied a broader fairness doctrine. Second, Congress rejected proposals to include a similar requirement regarding the discussion of public issues or questions. *See* 67 Cong.Rec. 5560–61 (1926); S.Rep. No. 772, 69th Cong., 1st Sess. 4 (1926). In other words, Congress specifically rejected proposals to include the fairness doctrine in the 1927 Act. In addition, two other attempts to write the fairness doctrine into statutory law failed. *See* S.Rep. No. 781, 73d Cong., 2d Sess. 8 (1934) (proposing language requiring equality of treatment for opposing views on "public question[s]"); H.R.Rep. No. 2106, 72d Cong., 2d Sess. 4 (1933) (adopting language in a bill passed by Congress but pocket-vetoed by the President requiring "equal opportunity for the presentation of both sides of public questions").

The foregoing demonstrates that the fairness doctrine was not enacted in 1927 and hence no such enactment could have been ratified in 1959. But the dissent actually appears to think the fairness doctrine was enacted for the first time in 1959. Aside from the fact that the language of the disclaimer and the Supreme Court's three discussions of it refute that idea, there is the fact that such a theory supposes a drastic step was taken without discussion. From the beginning, as the courts have repeatedly recognized, *Red Lion,* 395 U.S. at 380, 89 S.Ct. at 1801; *National Broadcasting Co. v. United States,* 319 U.S. 190, 225, 63 S.Ct. 997, 1013, 87 L.Ed. 1344 (1943); *FCC v. Pottsville Broadcasting Co.,* 309 U.S. 134, 138, 60 S.Ct. 437, 439, 84 L.Ed. 656 (1940), the Commission has been accorded broad and supple power to evolve rules and regulations to serve "the public interest." That flexibility is, and has been, the central feature of the Commission's authority. It would have been extraordinary if Congress in 1959 had intended to strip the Commission of all further discretion in this area and to freeze by statute the fairness doctrine in the form it had in 1959. That removal of discretion would have been particularly bold because, contrary to all past practice, Congress "would have stereotyped the powers of the Commission to specific details in regulating a field of enterprise the dominant characteristic of which was the rapid pace of its unfolding." *National Broadcasting Co.,* 319 U.S. at 219, 63 S.Ct. at 1011. One would have expected extended congressional discussion of the wisdom of such a move. There is none.

\* \* \* \* \* \*

The distinction between a statement that a policy is mandated and a statement that it is authorized is crucial, but it is a distinction the dissent systematically overlooks. There is every indication that Congress ratified the Commission's authority to evolve the fairness doctrine under the Act's public interest standard. But there is also every indication that Congress went no further. It did not legislate that, having created the

fairness doctrine, the Commission was henceforward required to keep it and apply it as it stood in 1959.

The dissent is quite correct in saying that "[t]he primacy of Congress as policy-maker should not be blunted or eviscerated by courts which find either the policy or the policy-makers in error." Dissent at 1118. That is precisely the reason we should not impute to Congress a statute that it never debated or enacted.