NOONAN, Circuit Judge,
concurring in the judgment:
Broadcast speech is protected by the First Amendment, but it has characteristics that distinguish it from most other forms of speech. Intermediate scrutiny must be applied to this modern medium unknown to the framers of the Constitution. FCC v. League of Women Voters, 468 U.S. 364, 380, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984). Broadcast speech, as it now exists, came into existence by the allocation by the government of space on the spectrum of frequencies for broadcasting. It is therefore licensed by the government. Of course, the government might have abstained from allocating frequencies, as it did before 1927. See Red Lion Broad. Co. v. FCC, 395 U.S. 367, 375-76, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). That road was not followed. Without effective challenge, the government took charge and rationed the frequencies. Broadcast television, as it exists today, exists as it does because the government has been a shaper of it. Speech by license of the government presents a formidable paradox in application of the First Amendment.
The appellant is licensed by the government as a not-for-profit broadcaster. It is authorized by license pursuant to 47 C.F.R. § 73.621(a), a regulation specifying that a license may be given to a “nonprofit educational organization upon a showing that the proposed stations will be used primarily to serve the educational needs of the community; for the advancement of educational programs; and to furnish a non-profit and noncommercial broadcast television service.” The nature of licensed broadcasting makes it inappropriate to draw guidance from a case such as City of Cincinnati v. Discovery Network, 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993), invalidating a city ordinance governing news racks.
When 47 U.S.C. § 399 was enacted, there was no evidence before Congress as to the impact of political speech on public broadcasting because no such speech had been permitted. What Congress had before it were educated guesses by persons familiar with the media. When this case began in 2006, the government did not produce any more evidence, because no more evidence existed.
Legislatures may often have to act on the basis of prediction rather than on the basis of evidence. The conduct of a war on poverty, or of an actual war, for example, may depend on such legislative guesswork. As I understand the teaching of the Supreme Court, however, a restriction on political speech, the “highest rung of the hierarchy of First Amendment values,” League of Women Voters, 468 U.S. at 381, 104 S.Ct. 3106, must normally be based on evidence of harm to a substantial govern *891 mental interest. Id. at 391, 104 S.Ct. 3106; Red Lion, 395 U.S. at 393, 89 S.Ct. 1794. Such evidence has not been provided to Congress. Accordingly, the ban on speech is an unconstitutional abridgement of the First Amendment.
This requirement was dropped by the plurality in Turner II relying on evidence introduced on remand to the district court—evidence obviously not before Congress when it enacted the statute in question. See Turner Broad. Sys., Inc. v. FCC, 520 U.S. 180, 200, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) (plurality opinion). It is unclear whether this example justifies other courts in not looking for evidence before Congress or in relying not on evidence but predictions. I believe that we are still bound by League of Women Voters, supra.
Citizens United v. FEC, — U.S.-, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010), decided a different question and is therefore not controlling here. It is, however, relevant in affording the view of governmental control of speech now taken by the United States Supreme Court. For example, Justice Kennedy writing for the Court observed:
While some means of communication may be less effective than others at influencing the public in different contexts, any effort by the Judiciary to decide which means of communications are to be preferred for the particular type of message and speaker would raise questions as to the courts’ own lawful authority. Substantial questions would arise if courts were to begin saying what means of speech should be preferred or disfavored. And in all events, those differentiations might soon prove to be irrelevant or outdated by technologies that are in rapid flux. Id. at 890.
The recognition of the “rapid flux” in the technologies and the recognition that “substantial questions would arise” if the courts favored or disfavored a particular means of speech suggest the sensitivity of the Court to the changing field of communication by television.
Justice Kennedy went on to state:
Courts, too, are bound by the First Amendment. We must decline to draw, and then redraw, constitutional lines based on the particular media or technology used to disseminate political speech from a particular speaker. Id. at 891.
This passage’s negative reference to basing “constitutional lines” on “particular media” could be read as embracing the special constitutional lines now governing broadcast media.
With the rapid flux of technologies transmitting television, there have come new forms of television that do not require use of the narrow spectrum employed by broadcast television. These new forms— cable, satellite, cell phone, the Internet and the iPad—have introduced a variety of ways of communicating on television and call at least for a new look at the government’s substantial role in licensing and regulating speech on broadcast television.
In short, in this delicate and difficult field of rapid change, it would be hard to believe that the restrictions on political speech established by the statute over thirty years ago are constitutionally valid even if they had met constitutional criteria when they were published.
Minority TV also challenges as “vague” the prohibition of § 399 of any advertisement intended “to promote any service, facility or product offered by any person who is engaged in offering such offering for profit.” The words are clear enough. What Minority TV appears to be objecting *892 to is the application of the statute as confusing or inconsistent.
As a viewer of Jim Lehrer NewsHour and its successor, I have seen announcements that to my mind are ads. For example, I have viewed Charles Schwab’s message, “Talk to Chuck”—it is not about Chuck’s golf game. I have viewed Chevron’s “We have more in common than you think”—it appears to me to promote Chevron’s business by asking me to identify with its efforts to improve the environment. I have watched as a pest control company has displayed the power of its techniques to eliminate a bug, a promotion of its services, one would suppose. But all of the above would be relevant on an as-applied challenge. Such a challenge must be brought as original matter in the court of appeals. Consequently, on this point, too, I concur in the result reached by Judge Bea.